# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**                                    **CR. No. 16-4571 JCH**

**GUY ROSENSCHEIN,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Rosenschein's *Motion to Suppress Statements* [Doc. 61], to which the Government filed a response [Doc. 81] and Defendant filed a reply [Doc. 85]. At issue is whether the FBI violated Rosenschein's constitutional rights during his interrogation.

On November 28, 2018, the Court held an evidentiary hearing on the motion, at which Defendant Guy Rosenschein (hereafter, "Rosenschein") was present. Although the Government offered its recording of the interrogation into evidence, the parties disagree about what was said at certain points during the conversation. As a result, after the November 28 hearing the parties requested the opportunity to confer and present the Court with a stipulated transcript. The Court granted the request, and they filed their partially stipulated transcript on December 6, 2018 [Doc. 117]. In that document, the parties noted where they continue to disagree about what Rosenschein said. After considering the briefs, the evidence presented by the parties, and the relevant legal precedents, the Court concludes that the Government did not honor Rosenschein's unambiguous invocation of his right to counsel, and therefore the motion should be granted.

## **LEGAL STANDARD**

On a motion to suppress a defendant's statement allegedly obtained in violation of defendant's *Miranda* rights, the Government bears the burden of proving by preponderance of evidence that the defendant's rights were not violated. *See United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998). For example, "[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

## **FACTS**[1]

For the limited purpose of ruling on the motion to suppress, the Court finds the facts as follows.

On November 8, 2016, law enforcement officers executed a state court search warrant for Rosenschein's home. He was arrested and taken to the police station by a Bernalillo County detective. There, an FBI agent interviewed Rosenschein and gathered information about his background. Rosenschein, a pediatric urologist who is originally from France but has lived and practiced medicine in the United States for decades, did not appear to have any problem understanding the agent, though he did speak English with an accent. After the interview, Rosenschein was informed of his *Miranda* rights and he agreed to participate in a polygraph examination administered by the agent. After the polygraph, Rosenschein participated in a two

---

[1] The Court derives these facts from the testimony presented at the hearing and the video recording of the interrogation, which the Court has reviewed repeatedly and carefully.

and a half hour interview with the agent, which was videotaped. This interview is the subject of Rosenschein's motion to suppress.[2]

The agent began the interview by telling Rosenschein that after reviewing the results of the polygraph, he had no doubt that Rosenschein had sexually touched a minor. Rosenschein was noncommittal, and the agent told him that he must decide what "path" he wanted to walk because "[i]t makes a difference for you. It makes a difference for what happens to you." After telling Rosenschein that he knows Rosenschein has achieved his professional goals by making some "hard choices," the agent said, "Today is the most difficult choice you will ever have to make." Then the agent told Rosenschein that he was the "last person in a long line of people who is going to talk to you and offer you an opportunity to be truthful but also get some help. I suspect that you are somebody who battles with urges and battles with things that give you pleasure but that you don't feel good about." After mentioning "programs" and "counseling," The agent told Rosenschein that "if you're honest about those things, it makes a difference. It makes a difference in the consequences you'll face. It makes a difference in the programs that are available to you. It makes a difference in your everyday personal life because you will feel better about it . . .." Then Rosenschein asked, "Where do we go from here?", and the agent told him that he should start by telling the truth "because those things make a difference for you." Then Rosenschein said, "Maybe, maybe I should get a lawyer."[3]

The agent immediately told Rosenschein that he could not go any further now that Rosenschein had made that statement, to which Rosenschein replied, "I don't say I, I don't want

---

[2] Rosenschein does not argue that his rights were violated prior to the video recorded interview.

[3] After carefully watching and listening to the video recording many times, the Court has concluded that Rosenschein said "Maybe, maybe I should get a lawyer."

to talk. I didn't say that." The agent said that he had to be very careful at this point and added, "What I need to know is whether or not you wanna talk to me now or whether or not you wanna stop talking and get a lawyer. Because understand, if you wanna stop talking and get a lawyer, you won't see me again. Okay?" Rosenschein then asked the agent what he wanted him to do, and the agent said that he wanted Rosenschein to make up his mind. The agent then stated that he could not answer Rosenschein's question, but he could offer Rosenschein "help": "I can offer you an opportunity to bear [sic] your soul and get things off your chest, but I can't do that if you wanna get an attorney. You have to make up your mind."

Rosenschein then asked what help the agent was offering, to which the agent replied, "cathartic help." When Rosenschein did not understand the word "cathartic," the agent explained that being truthful will help Rosenschein "from an emotional standpoint." The agent then continued, "if you're truthful with me and you describe to me the circumstances under which those things happened, that makes a difference. It makes a difference in what the consequences are for you, in what charges you'll face. It makes a difference in how people will view you." The agent said that defendants who do not show cooperation and remorse "get put in a different box" when charges are filed and when consequences are discussed. The agent then suggested that if Rosenschein revealed the problems he was struggling with, the agent could get Rosenschein help with "programs." After acknowledging that this would not make Rosenschein's problems go away, the agent told Rosenschein, "I legitimately and sincerely think that talking to me will make a difference for you, but you have to make up your own mind. I can't give you any legal advice." The agent then told Rosenschein that he did not believe that Rosenschein was "one of those people" who does not want help, but rather someone who had made mistakes but wants to do the right thing. "I wanna help you, but it means that you gotta talk to me. And it means you

have to make your mind up about what you want.... What I need to know is do you want to get an attorney, or do you wanna talk to me?"

At this juncture Rosenschein asked for five minutes alone, and the agent agreed. The agent left the room and a few moments later, Rosenschein stood up from his chair and put on his jacket. At this point, the agent returned and Rosenschein said, "I think I will take an attorney. It doesn't really matter. My life is over so when it is over it is over." The agent stated that he did not understand what Rosenschein said, and again Rosenschein announced (this time more audibly), "I will take a lawyer." The agent asked, "You want an attorney?" Rosenschein responded, "Yes. It's over anyway. Whatever. Even if I win, it's over. It doesn't mean I will not do something else."

The agent pressed on, telling Rosenschein that he could not talk to him anymore, to which Rosenschein responded, "Well, I didn't say I don't want to talk to you. I didn't say I want to remain silent. I just said I will take a lawyer." The agent did not end the conversation, but instead told Rosenschein, "Well, the—the point is is that at this point, given that you want an attorney, I have to stop talking to you. So, um—" Rosenschein responded to that with the statement, "I need some advice, and I need some legal advice."

At this point the agent said, "Well, let me tell you what's gonna happen from here forward." When Rosenschein agreed, the agent explained, "what will happen is you're gonna go to jail today," and stated that Rosenschein probably would be in state custody initially, but that Rosenschein's case was "likely going to be picked up federally" due to Rosenschein's alleged travel with a minor. At this point, Rosenschein started to object, saying that "this kid has nothing to do—" but was cut off by the agent, who stated that he was not asking Rosenschein questions. The agent continued, telling Rosenschein that it was likely going to be a federal prosecution and

there would likely be other charges. Then Rosenschein queried, "What is the penalty?" and asked the agent what would happen if he continued to talk to the agent. The agent responded that first they have to make sure that Rosenschein really wanted to talk to him because Rosenschein had stated that he wanted an attorney, but that the difference would be that Rosenschein got to tell his side of the story up front, and that it would make a difference not only in how Rosenschein would be "perceived in the legal system," but also "in the consequences and the charges that are brought against you." But then the agent quickly noted that he was not asking a question and did not want a response from Rosenschein but was merely trying to answer his question. Rosenschein said that he understood. Then the agent told Rosenschein, "If you decide not to talk to me and you still want an attorney today, chances are you're not gonna get to tell your side of the story to anybody in law enforcement going forward. Maybe you will, maybe you won't. But chances are probably not." At this point, Rosenschein informed the agent, "I'll talk to you. And I know what I'm doing."

The agent said that he needed to consult with other people to make sure that he "says the right words" to continue the interrogation, because "this is an unusual circumstance... I don't usually have people say, 'I want an attorney,' and then say, 'I don't want an attorney.'" There was a discussion off the record. When the agent returned to the conversation, Rosenschein said, "I will talk to you, but I will still take an attorney later on." Again, the agent responded that they needed to be careful and make sure that they understood exactly what Rosenschein did and did not want to do, and Rosenschein responded, "I want to talk to you, and I want to take a lawyer after."

The agent told Rosenschein that he was going to go over his rights one more time, so that there was no misunderstanding. The agent then summarized their conversation, which

Rosenschein agreed with. Next, the agent read out the *Miranda* rights on a written waiver form. Rosenschein said, "After I speak with you, I go to jail anyway," and the agent responded, "That's true." Again, the agent asked him if he understood his rights ("Yeah") and if he wanted to answer questions without a lawyer present. Rosenschein replied that he might answer only one question and change his mind. The agent said that Rosenschein could change his mind at any time he wanted. Then the agent asked, "So, this means that you are willing to answer questions now without a lawyer present?" Rosenschein responded, "Exactly."

The agent clarified, "Even though you said before you might wanna get an attorney or that you should get an attorney?" Rosenschein answered with a question of his own: "If I get an attorney, so I get him right now?" The agent explained that he would not get a lawyer immediately unless he had one on a retainer, but otherwise one could be appointed at a court hearing. "That would take days," replied Rosenschein. When the agent confirmed this, Rosenschein asked, "Would I get out of jail in the meantime or not?" The agent said that he did not know a lot about how state court works, and that it was possible that he could have a bail hearing and that they could release Rosenschein on his own recognizance, and there was a possibility that he would remain in custody, but the decision would belong to a judge. In response, Rosenschein said: "Okay. Let's go to jail. Forget it. I mean, it doesn't matter what I do. It's over. You know what I mean?" Then, Rosenschein confirmed that he was willing to talk to the agent without a lawyer present, acknowledged that he signed the waiver form, and asserted that he knew what he signed.

## DISCUSSION

Rosenschein argues that the Government violated his Fifth Amendment right to have counsel present during a custodial interrogation. He contends that he unambiguously invoked his

right to counsel, but the agent continued to interrogate him anyway in a violation of his *Miranda* rights. The Government, on the other hand, argues that while Rosenschein did eventually invoke his right to counsel, he also offered to talk to the agent and even asked the agent questions. Thus, the Government contends that the pair's conversation after the invocation of Rosenschein's rights was not interrogation and that it was Rosenschein who initiated additional communication with the agent. The Government also argues that Rosenschein's waiver of his right to counsel was voluntary and valid.

## I.    <u>Fifth Amendment Right to Counsel</u>

Rosenschein argues that the agent obtained his statements by violating his Fifth Amendment right to have counsel present during questioning, as that right has been explained by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under *Miranda*, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. 384 U.S. at 467-73, 86 S.Ct. 1602. Although a suspect may waive those rights, all questioning must stop if the suspect requests an attorney at any time during the custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Questioning may resume only if a lawyer has been provided or the suspect himself reinitiates communication with law enforcement. *Id.* This is a bright-line rule.[4] *United States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992). If the police subsequently initiate an encounter in the absence of counsel, the suspect's statements are presumed involuntary, even where the suspect executes a waiver. *McNeil v.*

---

[4] This bright line rule differs significantly from the "totality of the circumstances" analysis that the Court must apply when determining voluntariness under the Fifth Amendment right to due process.

*Wisconsin*, 501 U.S. 171, 177 (1991). This rule is designed to prevent police from badgering a suspect into waiving his previously asserted *Miranda* rights. *Id.*; *see also Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). "The only exception to this bright-line rule is where the accused initiates the conversation with the police." *Giles*, 967 F.2d at 386.

"[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citing *Edwards*); *United States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992) ("In *Edwards*, the Supreme Court expressly held that once an accused invokes his right to counsel, all questioning must cease until counsel is furnished, regardless of whether the accused is re-informed of his rights.").

### A.    Invocation of the Right to Counsel

The first step in the analysis is to determine whether the suspect has invoked his Fifth Amendment right to have counsel present at questioning. *Giles*, 967 F.2d at 385. To invoke this right, the suspect must have made "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.* (quoting *McNeil*, 501 U.S. 171, 111 S.Ct. at 2209). Whether a suspect unambiguously requested counsel is an objective inquiry. *United States v. Santistevan*, 701 F.3d 1289, 1292 (10th Cir. 2012). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350,

2355, 129 L.Ed.2d 362. "Rather, the suspect must unambiguously request counsel." *Id*. In *Giles*, the Tenth Circuit affirmed that the district court's conclusion that a suspect's question of when he would be given an opportunity to talk to an attorney could reasonably be construed as a request for an attorney, even though he did not expressly request an attorney. *See Giles*, 967 F.2d at 385-86.

Rosenschein argues that he first invoked his right to counsel when he said, "Maybe, maybe I should get a lawyer."[5] However, the Court agrees with the Government that due to the use of the word "maybe," this particular statement is ambiguous. In *Davis v. United States*, 512 U.S. 452 (1994), the defendant initially agreed to speak with Naval Investigative Service agents in connection with a murder investigation. About an hour and a half into the interview, he said, "Maybe I should talk to a lawyer." *Id*. at 455. However, when the agents inquired if he was asking for a lawyer, he replied that he was not. They took a short break, the agents reminded him of his rights, and the interview continued for another hour, until defendant asked to have a lawyer present before saying anything more. *Id*. The Supreme Court held that the defendant's initial statement, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel, and the officers had no obligation to cease questioning him. *Id*. at 461-62. Based on *Davis*, the Court concludes that Rosenschein's statement also is not an unambiguous invocation of his right to counsel.

However, Rosenschein did unambiguously invoke his right to counsel a few minutes later when the agent reentered the room. Rosenschein said, "I think I will take an attorney. It doesn't really matter. My life is over so when it is over it is over." This was Rosenschein's first clear

---

[5] The Court recognizes that Rosenschein does not agree that he said "maybe," but nevertheless concludes that is in fact what he said.

invocation of his right. When the agent stated that he did not understand what Rosenschein said, Rosenschein announced more clearly and emphatically, "I will take a lawyer." This was Rosenschein's second invocation of his right to counsel. The agent asked, "You want an attorney?" and Rosenschein responded, now for the third time, "Yes. It's over anyway. Whatever. Even if I win, it's over. It doesn't mean I will not do something else." These statements are, without a doubt, unambiguous invocations by Rosenschein of his right to counsel. The conversation did not end here, however. Harkening back to his statements earlier in the conversation about the "help" that he could offer Rosenschein, the agent told him, "[t]he point is I can't talk to you anymore," and Rosenschein responded, "Well, I didn't say I don't want to talk to you. I didn't say I didn't want to be examined. I just said I will take a lawyer." This is Rosenschein's fourth invocation of his right to counsel. Thus, at this point Rosenschein has reaffirmed his invocation of his right to counsel four times, but he also has indicated that he is willing to waive his right to remain silent.[6] Then the agent told Rosenschein that because he wanted an attorney, the agent must stop talking to him. In response, Rosenschein invoked his right to counsel for a fifth time, stating "I need some advice, and I need some legal advice."

The Government argues that the Tenth Circuit's opinion in *United States v. Brown*, 287 F.3d 965 (10th Cir. 2002) is instructive here. According to the Government, *Brown* stands for the proposition that when a defendant indicates that he wants to both talk to police and get a lawyer, those statements are necessarily conflicting and thereby render the invocation of the right to

---

[6] Although the Court acknowledges that there can be tension between invoking one's right to counsel while also agreeing to talk to police, that does not *necessarily* lead to ambiguity or nullify a request for an attorney. In the specific circumstances of this case in which Rosenschein both clearly and repeatedly stated that he wanted a lawyer, the only objectively reasonable interpretation of Rosenschein's statement to the agent is that he would be willing to talk to the agent with the assistance of a lawyer.

counsel equivocal. *See* Transcript, 11/28/2018 hearing at 140. The Court disagrees. In *Brown*, the interrogation was not recorded, *id.* at 971, so there was no detailed information regarding the exchange between the defendant and the agent. Instead, the defendant had signed a *Miranda* waiver form, in which he answered "yes" to three questions: "Do you wish to answer questions now without a lawyer present? Do you want a lawyer? Do you want to talk to a lawyer?" *Id.* at 970 n.2. In *Brown*, the defendant conceded on appeal that his responses to the *Miranda* warnings "were not clear and unambiguous," *Id.* at 972, and as a result the court did not even consider the issue of whether the defendant had successfully invoked his rights. Rather, the issue before the Tenth Circuit in *Brown* was whether the police had a duty, in light of defendant's admittedly ambiguous responses, to ask clarifying questions to determine whether he actually wanted an attorney. *Id.* The court concluded that while such clarifying questions are good police practice, they are not required under *Davis*. *Id.* at 972-73. Thus, *Brown* is not helpful in determining whether or not Rosenschein's request for a lawyer was ambiguous.

On the record before the Court in this case, however, there is no ambiguity. Rosenschein repeatedly and clearly stated that he wanted a lawyer, thereby invoking his Fifth Amendment right.

### B.    Continuation of Encounter After Invocation

At this point, the agent should have terminated the conversation, but he did not. As noted, *infra*, "In *Edwards*, the Supreme Court expressly held that once an accused invokes his right to counsel, all questioning must cease until counsel is furnished, regardless of whether the accused is re-informed of his rights." *United States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992). This rule is designed to prevent police from badgering a suspect into waiving his previously asserted *Miranda* rights. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). All questioning of a suspect

subject to custodial interrogation must end once he invokes his right to an attorney, until the attorney is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

The agent did not respect this bright-line rule and end the conversation. Instead, the agent told Rosenschein, "Well, let me tell you what's gonna happen from here forward," even though Rosenschein had not asked him what was going to happen. It was not Rosenschein who continued the conversation, as the Government has argued, nor was the agent responding to any inquiry from Rosenschein. Rather, the agent continued the encounter by telling Rosenschein, "what will happen is you're gonna go to jail today." The agent told Rosenschein that first he would be in state custody, but that later his case was "likely going to be picked up federally," i.e., that Rosenschein would probably face federal charges. When Rosenschein asked if the federal charges were because of his use of the internet, the agent told him it was because he travelled with a minor. This led Rosenschein to deny the involvement of the minor, but the agent quickly cut him off: "Listen, I'm not asking you questions." Then the agent told Rosenschein again that he would likely be charged federally based on "the Internet stuff and based on what's found on your computer." The agent added that there would probably be unspecified "other charges" as well. Finally, after this unsolicited "explanation" from the agent, Rosenschein asked, "What is the penalty?" and inquired what would happen if he did in fact talk to the agent at that time. The agent said that first they would have to make sure that Rosenschein really wanted to do that. The agent followed that up with the suggestion that by talking to him now without an attorney, Rosenschein would get a better result from the legal system: "You would get the opportunity to tell your side of the story right up front, and that makes a difference, in term of how you're perceived in the legal system. It makes a difference in the consequences and the

charges that are brought against you. It makes a difference." Then the agent implied that Rosenschein must act quickly, telling him that if he insisted on getting an attorney that day rather than talking to the agent, "chances are you're not gonna get to tell your side of the story to anybody in law enforcement going forward." Thus, the agent suggested that Rosenschein would lose any future opportunity to cooperate with law enforcement as well as the resulting benefits he had described. At this, Rosenschein capitulated and said, "I'll talk to you."

The Government contends that Rosenchein voluntarily waived his right to counsel after reinitiating communication with the agent. *See* Doc. 81 at 7-8, 10-11. However, as the Court has thoroughly explored above, Rosenschein could not "reinitiate" communication with the agent because the agent never stopped the conversation in the first instance. "[O]nce a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present." *Rhode Island v. Innis*, 446 U.S. 291, 293 (1980). The Government argues that the agent had stopped *interrogating* Rosenschein and was merely providing him with "information" about what was going to happen, and that this was the agent's "standard practice." However, in *Innis* the Supreme Court held that "interrogation" under *Miranda* refers not only to express questioning, but also to its "functional equivalent"—that is, any words or actions on the part of the police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. 1682. There can be no doubt that the agent's remarks to Rosenschein would be reasonably likely to persuade Rosenschein to make incriminating statements. The agent told Rosenschein that (1) he was going to go to a state jail that day, (2) he would likely face federal charges plus other unspecified charges but that (3) if Rosenschein talked to the agent without waiting for an attorney, it would "make a difference" in the charges against him and the consequences he would suffer, and (4) Rosenschein would likely

not have another opportunity to reap those benefits. The agent's statements clearly convey that Rosenschein would be better off if he talked to the agent immediately instead of waiting for a lawyer.

This case is similar to *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004). In that case, Rambo clearly stated that he did not want to discuss the robberies of which he was accused, but the officer made no move to end the encounter. Instead he continued the conversation by reminding Rambo that police from other towns were after him and telling Rambo that he would be charged with two aggravated robberies and that the other law enforcement agencies would want to speak with him. *Id*. at 908. These statements induced Rambo to confess. *Id*. The Tenth Circuit rejected the Government's claim that it was Rambo who reinitiated communications after invoking his right to remain silent by noting that the officer's statements constituted interrogation:

> [The Government's] argument ignores Moran's active role in continuing the interview after Rambo invoked his rights. When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further.

*Id*. at 911. Thus, the Tenth Circuit concluded that Rambo's capitulation and agreement to talk to police was not at his own behest but rather was a product of the improper interrogation that continued after he invoked his right to silence. *Id*. That is essentially what happened in this case. Rosenschein unambiguously invoked his right to counsel, but the agent did not terminate the encounter. Instead, he proceeded to attempt to elicit an incriminating response from Rosenschein by highlighting the "benefits" of talking without waiting for a lawyer. Like the officer in *Rambo*,

the agent played an active role in continuing the interview after Rosenschein invoked his rights. It was this interrogation that persuaded Rosenschein to make incriminating statements to the agent without the advice of counsel. To reach any other conclusion, this Court would have to ignore the agent's active role in continuing the interview after Rosenschein invoked his rights.[7]

Because the Court concludes that Rosenschein did not reinitiate communication with the agent, it need not determine whether his subsequent waiver of *Miranda* rights was voluntary. Once a defendant has invoked his right to counsel, if the police initiate an encounter in the absence of counsel, the suspect's statements are presumed involuntary, even where the suspect executes a waiver. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). The fact that Rosenschein signed a waiver does not change this result: "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675, 681 (1988). The fact that Rosenschein later waived his right to counsel and spoke to the agent does not change or cure the initial violation of his right to counsel.

---

[7] The other Tenth Circuit cases cited by the Government are distinguishable on their facts. In *United States v. Mora*, 2000 WL217433 (10th Cir. 2000) (unpublished), the defendant insisted on continuing to make incriminating statements during the booking process despite being reminded by the officer, who was merely performing duties such as fingerprinting, that he had invoked his *Miranda* rights. In *United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997), an agent's question, posed to the other agents to determine whether Mr. Zarate had invoked his right to counsel, did not constitute interrogation because it was not calculated to elicit a response from the defendant. Further, the question was asked 30 minutes after the other agents had stopped interrogating the defendant and was not a continuation of the same conversation. When the agent explained the benefits of cooperation, it was in response to a question from the defendant. In *United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir. 1994), it was the defendant who initiated the conversation after agents had stopped questioning him because he had invoked his *Miranda* rights. Finally, in *United States v. Trimble*, 986 F.2d 394, 401 (10th Cir. 1993), the defendant began asking the agents questions immediately after they read him his *Miranda* rights; after they answered his questions, he made an incriminating statement. None of these cases present facts similar to those in this case.

Having found that Rosenschein invoked his Fifth Amendment right to counsel and the agent did not terminate the conversation but rather continued to make statements intended to elicit an incriminating response, the Court concludes that Rosenschein's constitutional rights were violated. Rosenschein did not reinitiate communication with the agent, and therefore his subsequent waiver of his *Miranda* rights was invalid.

**IT IS THEREFORE ORDERED** that Defendant Rosenschein's *Motion to Suppress Statements* [Doc. 61] is **GRANTED**.

_____

**UNITED STATES DISTRICT JUDGE**