# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    CR. No. 16-4571 JCH

GUY ROSENSCHEIN,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant Dr. Rosenschein's Motion to Compel Production of NCMEC Materials* [Doc. 57]. Defendant Guy Rosenschein ("Rosenschein") seeks to compel the Government to produce certain information in the possession of the National Center for Missing and Exploited Children ("NCMEC") in accordance with Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). The questions at the heart of the motion are whether NCMEC is part of the prosecution team for purposes of discovery, and whether the information Defendant seeks to compel is material to his defense. On April 4, 2019, the Court held a hearing on the motion at which Defendant was present. In ruling on the motion, the Court has considered the evidence presented at the hearing, the arguments of counsel, and the parties' written submissions. *See* Docs. 57, 65, 72,76, 102, and 106. The Court concludes that for purposes of this particular case NCMEC is part of the prosecution team. In addition, the Court concludes that some, but not all, of the documents that are the subject of the motion to compel are material. Therefore, the Court concludes that the motion should be granted in part and denied in part as further described herein.

## BACKGROUND

Law enforcement began investigating Rosenschein when the Bernalillo County Sheriff's Office ("BCSO") received two CyberTipline Reports from NCMEC. Under federal law, NCMEC is

> statutorily obliged to operate the official national clearinghouse for information about missing and exploited children, to help law enforcement locate and recover missing and exploited children, to "provide forensic technical assistance ... to law enforcement" to help identify victims of child exploitation, to track and identify patterns of attempted child abductions for law enforcement purposes, to "provide training ... to law enforcement agencies in identifying and locating non-compliant sex offenders," and of course to operate the CyberTipline as a means of combating Internet child sexual exploitation.

*Ackerman v. United States*, 831 F.3d 1292, 1296 (10th Cir. 2016) (citing 42 U.S.C. § 5773(b)).

The two CyberTipline Reports that BCSO received were generated by Chatstep, an electronic service provider that hosts internet-based conversations (also known as "chats") between users. On July 31, 2016, NCMEC received CyberTipline Report 13456293 ("Jul. 31 Report"), in which Chatstep notified NCMEC that an image of child pornography was uploaded through its service. On August 8, 2016, NCMEC received CyberTipline Report 13596645 ("Aug. 8 Report"), wherein Chatstep notified NCMEC that a second image of child pornography was uploaded through its service. In both reports, Chatstep indicated that the user responsible for uploading the images was identified as "Carlo."

The Government alleges that the CyberTipline Reports submitted to NCMEC indicate that the contraband images were submitted on behalf of Chatstep and PhotoDNA. PhotoDNA is a cloud-based service developed by Microsoft to help prevent the sharing of harmful, child exploitation images. PhotoDNA works by obtaining the hash value of a file and converting the

file into a numerical value that is matched against databases of hash values of known child pornography. Through its use of PhotoDNA, Chatstep identified the two images distributed by "Carlo" as child pornography before the images were submitted to NCMEC. Chatstep did not submit to NCMEC the content of the chat session during which these images were distributed— it only submitted the contraband images. NCMEC did not view the images, but it did use the IP address information to investigate the probable physical location of the internet user "Carlo." Upon finding that location to be Albuquerque, NCMEC forwarded the material to the New Mexico Attorney General's Office Internet Crimes Against Children ("ICAC") Task Force, and shortly thereafter BCSO initiated a criminal investigation.

## DEFENDANT'S DISCOVERY REQUESTS

Defendant seeks to compel NCMEC to produce the following information:

A.      All correspondence that NCMEC sent to the developers or owners of the domain name "Chatstep.com" at either the email address devs@chatstep.com or the street address 10190-1 Pasadena Ave., Cupertino, California 95014. This request includes, but is not limited to, all requests that NCMEC made to Chatstep to sign up for its CyberTipline, the NCMEC receipts for the alleged child porn associated with this case, and all monthly reports addressing NCMEC's "VPN list."

B.      All correspondence that NCMEC sent to or received from Microsoft.com concerning Microsoft's PhotoDNA program addressing the financing or technical development of the PhotoDNA software or any associated API, or NCMEC's specific needs or software requirements to run the program or any associated API.

C.      Microsoft.com's and Chatstep.com's registration date and related registration materials and documents detailing Chatstep.com's and Microsoft.com's (or Microsoft's PhotoDNA subsidiary) registration for NCMEC's CyberTipline.

D.      All NCMEC's Memorandum of Understandings or similar agreements with either Chatstep.com or Microsoft.com addressing the sharing of NCMEC's library or platform of hash values associated with child pornography images or videos.

E.      All documents, contracts, communications, memorandums, or notes of any kind addressing financial or technical support for Microsoft's PhotoDNA program, whether the financial or technical support was running from Microsoft to NCMEC, or from NCMEC to Microsoft.

F.      All reports, coming from any source or entity whatsoever, or being delivered to any source or entity, concerning the two reports of child pornography in this case from July 31, 2016 (CyberTipline Report 13456293) or August 8, 2016 (CyberTipline Report 13596645).

G.      All of NCMEC's presentation materials, including all drafts of those materials, and all related correspondence with prosecutors and law enforcement officers about the presentation, for the Crimes Against Children conference for 2017 addressing the following presentation: "Emerging Issues and Insights Related to Child Pornography Cases Based on CyberTipline Reports."

H.      All correspondence, in any form, that came from Microsoft's PhotoDNA program, or the API associated with the PhotoDNA program, involving the two CyberTipline reports related to this case: the July 31, 2016 CyberTipline Report 13456293, or the August 8, 2016 CyberTipline Report 13596645.

**<u>DISCUSSION</u>**

Defendant argues that under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963), he is entitled to the above-listed discovery from NCMEC. He further argues that under *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016), NCMEC is a federal law enforcement agency that participated in this case, making it subject to Rule 16 because NCMEC "qualifies as a governmental entity," *id*. at 1297. Therefore, materials in the possession, custody and control of NCMEC fall within the Government's Rule 16 discovery obligations as such materials are directly related to the Government's effort to prosecute Defendant. *See* Doc. 57. The Government, in turn, contends that Defendant's argument is premised on an unjustifiably expansive reading of *Ackerman*. According to the Government, NCMEC is not part of the "prosecution team" and therefore the Government is not responsible for producing information in the custody of NCMEC. The Government further argues that Rosenschein has failed to demonstrate that the requested information is material to his defense.

I.      **The Government's Discovery Obligations**

   A.      ***Brady***

A defendant may seek discovery under multiple legal authorities. The Due Process Clause requires that the government disclose any evidence to the defendant that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has clarified that a defendant is entitled to receive exculpatory evidence even if he does not request it. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) ("Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government.").

Even though the government has a demanding duty to disclose exculpatory information, it does not have to take affirmative steps to discover information it does not possess. *United States v. Combs*, 267 F.3d 1167, 1173 (10th Cir. 2001). But this does not mean the prosecutor can engage in willful ignorance. Brady requires a prosecutor to "disclose information of which [he or she] has knowledge and access*." United States v. Burton*, 81 F. Supp. 3d 1229, 1249 (D.N.M. 2015). The "prosecution" includes "not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as ... other arms of the state involved in investigative aspects of a particular criminal venture." *Smith*, 50 F.3d at 824 (internal citation and footnote omitted). Thus, although a prosecutor may be required to search files maintained by governmental agencies that are part of the prosecution team, a prosecutor does not have a duty to obtain evidence from agencies that are not part of the prosecution team. *Id*. This is because

> knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993)). Because "investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure" under *Brady*. *United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989) (quoting *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989)). Thus, it becomes

important to understand who is part of the prosecution team and what factors affect that determination.

However, the inquiry does not end there, because the Defendant must also demonstrate that the requested evidence is material. *Brady* requires the prosecution to produce to the defendant, in advance of trial, material exculpatory evidence that is in its possession. 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 110-111 (1976). The "touchstone of materiality is a 'reasonable probability' of a different result," which is present "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). Thus, to establish *Brady* materiality, a defendant need not show that the evidence, if disclosed, would have resulted in his acquittal. Instead, the necessary showing is that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 434-35. A defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987).

The *Brady* rule is not an evidentiary rule that grants broad discovery powers to a defendant, because there "is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). *See also United States v. Agurs*, 427 U.S. at 109-10 ("[T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.")

(internal quotations and citations omitted), *reversed on other grounds by Bagley*, 473 U.S. 667;

*Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) ("*Brady* does not require a prosecutor to

turn over files reflecting leads and ongoing investigations where no exonerating or impeaching

evidence has turned up."). "Evidence is material only if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been

different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). And a reasonable probability is a

"probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks

omitted).

### B.      Rule 16

In addition to *Brady*'s discovery requirements, Federal Rule of Criminal Procedure

("Rule") 16(a) sets forth additional discovery obligations. Specifically, Rule 16(a)(1)(E) provides

that the government must allow defendants access to documents and objects "within the

government's possession, custody, or control" where "(i) the item is material to preparing the

defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item

was obtained from or belongs to the defendant." The Tenth Circuit has not yet defined "the

government" for purposes of Rule 16. The courts that have defined "the government" for

purposes of Rule 16 interpret the phrase to include only the prosecution team. *See United States

v. Poindexter*, 727 F. Supp. 1470, 1477 (D.D.C. 1989) ("Rule 16(a)(1)[ (E) ], requires only the

production of documents in the hands of the prosecutor, any investigative unit under the

prosecutor's control, and any other federal agency allied with the prosecution or involved in the

prosecution of criminal litigation."); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y.

1999) ("Courts have construed the term 'government' in this rule narrowly to mean the

prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the 'government' in general."); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) ("[T]he Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the Brady line of cases."); *United States v. Weiss*, 2006 WL 1752373, *7 (D. Colo. June 21, 2006) (considering a defendant's request for documents from a non-party executive agency and concluding that no duty to disclose existed under *Brady* or Rule 16). Courts reason that the same concerns that exist in the *Brady* context—that a "monolithic view" of government would "condemn the prosecution of criminal cases to a state of paralysis"—apply with equal force in the Rule 16 context. *Chalmers*, 410 F. Supp. 2d at 289.

### C.    Prosecution Team

Under *Brady*, the prosecution's duty to disclose material impeachment evidence that is favorable to the defense arises even if the prosecutor has no "actual knowledge of the existence of the evidence at issue" because—for *Brady* purposes—the "prosecution" includes "not only the individual prosecutor handling the case, but also ... the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) (internal citation and footnote omitted). Accordingly, we impute knowledge of material impeachment evidence to the prosecutor for *Brady* purposes when that knowledge is in the possession of other "agents of the prosecution." *See id.* at 824-25 (quoting *Fero v. Kerby*, 39 F.3d 1462, 1472 n. 12 (10th Cir. 1994)); *see also Avila v. Quarterman*, 560 F.3d 299, 307 (5th

Cir. 2009) ("It is well settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors.").

In *Smith*, the Tenth Circuit stated that "the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, as well as law enforcement personnel *and other arms of the state* involved in investigative aspects of a particular criminal venture." 50 F.3d at 824 (citations and footnote omitted) (emphasis added).

Unfortunately, there are few cases in which the Tenth Circuit has analyzed whether a person or entity is part of the prosecution team. In *McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016), the court considered the role of a sexual assault nurse examiner in determining whether she was member of the prosecution team. The nurse had examined the rape victim at the behest of law enforcement as part of a criminal investigation into an allegation of sexual abuse, and the nurse testified that she kept a record of the exam to prepare herself to testify later. *Id*. Based on those facts, the court concluded that the nurse was part of the prosecution team for *Brady* purposes because "she acted at the request of law enforcement in the pre-arrest investigation of a crime." *Id*. at 1247-48.

Outside the Tenth Circuit, there are few cases that have set forth a framework for analyzing who is part of the prosecution team. The Third Circuit has stated that the prosecution team may include investigative or prosecutorial personnel. *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991) (citing *United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)). In addition, a court should consider whether the agency in question and the prosecutor conducted a joint investigation, and whether the prosecution is able to direct the actions of the agency. *United*

*States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005). *See also United States v. Casas*, 356 F.3d 104, 116 (1st Cir. 2004) (concluding that government had no Brady obligation to disclose evidence that was not in its files, but rather with another agency not under its supervision in the case).The Seventh Circuit held that *Brady* did not require the prosecution to seek out allegedly exculpatory information in the hands of other government agencies when prosecutors had been unaware of the existence of that information, and none of those agencies were part of the team that investigated the case or participated in its prosecution. United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996).

To this Court's knowledge, whether NCMEC is a member of the prosecution team in a case after forwarding a CyberTipline Report to law enforcement is a question of first impression, not only in the Tenth Circuit, but in the federal courts generally.

## II.     NCMEC's Status Under Statutory and Tenth Circuit Law

According to federal law, NCMEC has broad powers that appear to venture into the realm of investigation and prosecution of crimes against children. For example, NCMEC's authorizing statute provides in pertinent part that it must "operate a national 24-hour toll-free hotline by which individuals may report information regarding the location of any missing child, and request information pertaining to procedures necessary to reunite such child with such child's parent" as well as "operate the official national resource center and information clearinghouse for missing and exploited children." 34 U.S.C. §§ 11293(b)(1)(A)(i) and (b)(1)(B). NCMEC must operate a similar hotline for individuals and electronic service providers to report internet-related child sexual exploitation, including the possession, manufacture, and distribution

of child pornography. *Id*. at § 11293(b)(1)(K)(i)(I)(aa). In addition, under 34 U.S.C. § 11293(a)(3) (formerly codified at 42 U.S.C. § 5773), NCMEC must "provide for the furnishing of information derived from" the Cyber Tipline to "appropriate entities." NCMEC is authorized to provide technical assistance and training to law enforcement agencies in the prevention, investigation, prosecution, and treatment of cases involving missing and exploited children" and provide assistance to law enforcement agencies "involved in the location and recovery of missing and abducted children." 34 U.S.C. § 11293(b)(1)(E)(i) and 11293(b)(1)(F). Also, NCMEC can "work with … law enforcement agencies, electronic service providers, … and others on methods to reduce the existence and distribution of online images and videos of sexually exploited children," *Id*. § 11293(b)(1)(K). Finally, NCMEC may provide technical assistance and training to local law enforcement agencies in identifying and recovering children who are missing or at risk for child sex trafficking. *Id*. § 11293(b)(1)(M) and (O).

The breadth of these and other powers afforded to NCMEC has led the Tenth Circuit to conclude that NCMEC is a governmental entity for purposes of the Fourth Amendment's prohibition on unreasonable searches and seizures. *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016). The Court based this conclusion on five considerations. First, the court noted that NCMEC has law enforcement powers, and those powers extend well beyond those enjoyed by private citizens. *Id*. at 1296. NCMEC's two primary authorizing statutes—18 U.S.C. § 2258A and 42 U.S.C. § 11293(b)—mandate its collaboration with federal (as well as state and local) law enforcement in over a dozen different ways, many of which involve duties and powers conferred on and enjoyed by NCMEC but no other private person. *Id*. For example, NCMEC is statutorily obliged to maintain an electronic tip line for internet service providers ("ISPs") to use to report

possible Internet child sexual exploitation violations to the government. Under the statutory scheme, NCMEC must forward every single report it receives to federal law enforcement agencies and it may make its reports available to state and local law enforcement as well. *Id.* Second, ISPs are required to report any known child pornography violations to NCMEC—not to any other governmental agency, but rather to NCMEC alone. *Id.* ISPs who fail to comply with this obligation face substantial (and apparently criminal) penalties payable to the federal government. *Id.* Third, when NCMEC confirms it has received a report, the ISP must treat that confirmation as a request to preserve evidence issued by the government itself. Failure to comply again opens an ISP to potential civil or criminal sanctions. *Id.* at 1297. Fourth, in aid of NCMEC's tip line functions, Congress has statutorily authorized it to receive contraband (child pornography) knowingly and to review its contents intentionally. *Id.* The court observed that these are actions that would normally subject private persons to criminal prosecution. Fifth, the Tenth Circuit compared NCMEC to Amtrak, and analogized cases wherein the Supreme Court held that Amtrak—a publicly owned corporation—is a governmental entity. *Id.* at 1297-98. Of primary consideration here were the level of governmental control over both NCMEC and Amtrak, the broad statutory mandates to which both entities are subject, their dependence on federal funding, the purpose behind each entity's creation, and the benefits they each conferred on the government. Based on all the foregoing factors, the Tenth Circuit concluded that NCMEC is a governmental entity. Alternatively, the Court found that NCMEC acted as an agent of the government in that case and was therefore subject to the Fourth Amendment. *Id.* at 1301-02.

The Government argues, and the Court concurs, that just because an entity is a government entity or agent for purposes of a Fourth Amendment analysis does not necessarily mean that it is part of the prosecution team for discovery purposes in a particular case.

## III.    Analysis

### A.    Prosecution Team

####        1.    Evidence Regarding NCMEC's Involvement in the Investigation

The Government contends that in this case, NCMEC's actions do not bring it within the ambit of the prosecution team. In support, the Government has provided the Declaration of John Shehan, the Vice President of the Exploited Children Divison of NCMEC. *See* Doc. 72-1. According to Shehan's declaration, after it received the two CyberTipline Reports at issue, NCMEC merely took the information in the reports and, using automated processes, ran open-source queries on databases that are available to the public. *See* Shehan Decl., Doc. 72-1, at ¶ 12. Using that publicly available information, NCMEC was then able to confirm that the IP address associated with the CyberTips was linked to Albuquerque, New Mexico. *See* Shehan Decl., Doc. 72-1, at ¶¶ 16, 19, 22. Then, having discovered the geographical connection, NCMEC forwarded the tips to law enforcement in New Mexico. *See* Shehan Decl., Doc. 72-1, at ¶ 23. No one from NCMEC reviewed the materials submitted by ChatStep with the tips. *See* Shehan Decl., Doc. 72-1, at ¶ 12, 17-18, 20-21. Finally, Shehan avers that the prosecution team does not direct NCMEC's actions: "NCMEC created and directs the daily operation of the CyberTipline without government involvement. Neither the government nor any law enforcement agent created the

CyberTipline and neither directs or controls NCMEC in its operation of the CyberTipline or in its processing of CyberTipline reports." Shehan Decl., Doc. 72-1, at ¶ 7.

On the other hand, Rosenschein argues that the Government should err on the side of disclosure and conclude that NCMEC is part of the prosecution team. He points to the Department of Justice Memorandum Regarding Guidance for Prosecutors Regarding Criminal Discovery ("Ogden memo"), authored by former Deputy Attorney General David W. Ogden, dated January 4, 2010 and cited in *United States v. Harry*, Cr. No. 10-1915, at *9 (D.N.M. Oct. 10, 2014) (Browning, J.: "United States prosecutors are 'encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes.'" *Id.* at *4 (quoting the Ogden memo). In addition, Rosenschein argues that NCMEC's actions are enough to bring it within the "prosecution team" in this case. He contends that by forwarding the CyberTipline Reports to law enforcement, NCMEC prompted and participated in the prosecution of this case. Found in *Ackerman* to be a governmental entity with law enforcement powers that "extend well beyond those enjoyed by private citizens," *Ackerman*, 831 F.3d at 1296, NCMEC operates the CyberTipline as a means of combating Internet child sexual exploitation and therefore "acted as a government-sanctioned investigator when it provided the CyberTipline report originating with Microsoft's PhotoDNA program to the New Mexico Attorney General's Office." Doc. 76 at 3. Rosenschein contends that NCMEC's failure to view the images in this case is not dispositive because "[w]ithout NCMEC's service as the national clearinghouse for CyberTipline reports generated by Microsoft, the criminal case against Dr. Rosenschein would have never materialized." Doc. 76 at 3. Taking his argument to its logical conclusion,

Rosenschein asserts that NCMEC is "part of the investigatory team in every criminal case that involves a CyberTipline report." Doc. 102 at 3.

At the April 4, 2019 hearing, Rosenschein also provided the Court with evidence regarding NCMEC's involvement in the investigation beyond that described in Shehan's affidavit. Rosenschein tendered a NCMEC report showing that on November 15, 2016 (approximately one week after the search of Rosenchein's home), Detective Hartsock sent NCMEC files obtained from a thumbdrive found in Rosenschein's car. *See* Hearing Exhibit P. The report notes that Hartsock submitted 1,120 files from the thumbdrive, and that of those NCMEC recognized the hash values on 174 of them. Another 41 files on the thumbdrive contained images of a child or children previously identified by law enforcement. The only reasonable inference is that Hartsock sent these files to NCMEC in order to obtain information that would aid in his investigation.

2.  Analysis

It appears that federal courts have not yet directly addressed the issue of whether NCMEC is a member for the prosecution team for purposes of discovery. The Government urges the Court to look to the district court decision in *United States v. Wolfenbarger*, Case No. 16-cr-519 LHK (NC), Doc. 43, (N.D. Ca. Jan. 12, 2018) (unpublished) for support, but the decision offers little insight. NCMEC was not discussed in *Wolfenbarger*, which in any event was decided on the issue of materiality, not whether any entity was part of the prosecution team. Both parties have cited the Tenth Circuit's unpublished decision in *United States v. Webb*, 651 Fed. Appx. 740 (10th Cir. June 2, 2016), which also did not involve NCMEC. Rather, the issue in *Webb* was whether the government had committed a *Brady* violation by failing to disclose information in

the possession of the U.S. Army that could have been used to impeach one of its key witnesses. *Id*. at 744. There was no evidence that the prosecution knew about the impeachment evidence. The Court stated, "the U.S. Attorney's Office is not required to disclose information it is unaware of and that is in the possession of a separate federal agency not i*nvolved in the prosecution or investigation of the present case*." *Id*. (emphasis added). More recently, this court noted that it will not compel the government to seek and produce "information from agencies … who are not collaborating in [the] prosecution *or who have not provided information to the government* in connection with this case." *United States v. Boutte*, 2019 WL 885935 at *3 (D.N.M. Feb. 22, 2019) (Carson, J., sitting by designation) (unpublished) (emphasis added).

Under the facts of this case, the Court concludes that NCMEC is part of the prosecution team for discovery purposes. NCMEC did conduct, as it is charged to do by statute, a limited investigation into the facts of this case. This included an investigation to identify the location of the suspected internet user through the IP address provided in the CyberTipline reports, and then providing that information, along with the CyberTipline report(s), to the New Mexico Attorney General's Office. It was NCMEC's acts of investigating the location and providing CyberTipline information to the geographically appropriate law enforcement agency that effectively commenced the prosecution of this case. Later, after law enforcement obtained electronic materials from Rosenschein's home, Hartsock sent those files to NCMEC for analysis in order to obtain more information to aid in his investigation. Thus, in the language of the Tenth Circuit in *Webb* and of Judge Carson in *Boutte*, NCMEC has been *involved in the investigation of the case*, and has *provided information to the government* in aid of the prosecution. The Court

acknowledges that in this particular case, NCMEC's actions were somewhat limited. However, they are enough to make NCMEC part of the prosecution team.

###    B.    Materiality

####        1.    The Defendant's Three Motions to Suppress

Rosenschein argues that the documents he seeks are material because they relate directly to the defenses he raises in his motions to suppress.

In his first motion to suppress, *Motion to Suppress Evidence & Request for an Evidentiary Hearing Under Franks v. Delaware* [Doc. 71], Rosenschein asks the Court to suppress all evidence collected from the search of his home pursuant to a warrant issued on November 7, 2016. Rosenschein argues that the judge who signed the search warrant was misled by the affidavit prepared by Detective Kyle Hartsock of the Bernalillo County Sheriff's Office because it contained false and misleading statements. Specifically, he claims that Hartsock's affidavit stated that Chatstep had reported that its user "Carlo" had uploaded an image of child pornography, when in fact it was Microsoft that made that report. Further, he contends that the language Hartsock used in the affidavit falsely *implied* to the judge that a human being at Chatstep had viewed the images and determined them to be child pornography, when in fact the entire process was automated and Hartsock was the first person to actually look at the photographs. Next he argues that the affidavit incorrectly stated that the name Carlo was a "temporary name," when in fact neither Chatstep nor Microsoft knew that, but rather knew only that it was the screen or user name. He asserts that Hartsock falsely stated that "Carlo" had sent an image of child pornography to another user, when in that did not happen because PhotoDNA intercepted the images before anyone else received them. Finally, he contends that Hartsock's

affidavit failed to describe the images at issue with sufficient particularity for the judge to make an independent determination that they contain child pornography. Defendant argues that under *Franks v. Delaware*, 438 U.S. 154 (1978), the Court should first excise the false and misleading statements from the affidavit and then conclude that the corrected affidavit does not support a finding of probable cause to search his home.

In his second motion to suppress, *Defendant Dr. Rosenschein's Motion to Suppress Evidence Under Ackerman* [Doc. 74], Rosenschein argues that Microsoft has become an agent of NCMEC. He contends that this agency relationship is a result of Microsoft's close collaboration with NCMEC (a government agency under the Tenth Circuit's *Ackerman* decision) in developing and implementing both PhotoDNA software and a sharable library of hash values obtained from images of known child pornography. He further argues that NCMEC "badgered" Chatstep into signing up for PhotoDNA and the CyberTipline. According to Rosenschein, Microsoft's PhotoDNA conducted a "search" of his private, constitutionally protected communications, and because Microsoft is an agent of a federal law enforcement agency, it must comply with the Fourth Amendment's warrant requirement before conducting such searches. As a result, Rosenschein moves to suppress all evidence obtained from ChatStep in the two CyberTipline reports as well as "the fruits of evidence flowing from those searches" (including evidence collected from the search of Rosenschein's home).

In his third motion to suppress, *Motion to Suppress Evidence Due to Detective Hartsock's Unconstitutional Conduct* [Doc. 77], Rosenschein seeks "suppression of all evidence collected from the household of Defendant [], as well as the fruits of all evidence collected from that search." He contends that Hartsock's observation of the images at issue in this case were the

19

product of an unconstitutional warrantless search. Rosenschein argues that the unconstitutional viewing of the images means that all references to such evidence in Hartsock's affidavit must be stricken, and that the remaining contents of the affidavit do not support probable cause because Hartsock failed to describe the images with the requisite particularity. Rosenschein acknowledges that the "substance" of his motion is included in his first motion to suppress. *See* Doc. 77 at 1 n.1.

2.    <u>Arguments in the Briefs Pertaining to Materiality</u>

In his motion [Doc. 57 at 5], Rosenschein states in conclusory fashion that the requested information is material to the preparation of his defense and pretrial motions, including his motions to suppress, because without them his counsel cannot effectively litigate those motions. He also claims that without the documents his counsel cannot provide him with fully-informed advice during plea discussions. *Id.* However, in his initial motion Rosenschein does not explain why this is the case. Further, Rosenschein's reply [Doc. 76]] does not put additional meat on the bones of his argument. He contends in conclusory fashion and without explanation that he needs the requested information is essential to his motions to suppress and his chain of custody defenses without once explaining how any of his requested categories of documents tie into those defenses. *See* Doc. 76 at 4-7.

Finally, in his third [Doc. 102] and final brief in support of the motion, Rosenschein finally begins to explain how the documents he requests may be material. First, he argues that the documents are material to his *Ackerman* argument that the manner in which the evidence against him was collected violated his Fourth Amendment rights. Rosenschein contends that the requested materials will show the nature of the agency relationship between Microsoft, NCMEC,

and Chatstep. He asserts that they will show (1) that NCMEC repeatedly urged Chatstep to sign up for NCMEC's CyberTipline service "under penalty of federal sanctions," Doc. 102 at 5 (2) whether NCMEC alerted Chatstep to Microsoft's PhotoDNA program, and (3) the entanglement between NCMEC and Microsoft and their collaboration in developing PhotoDNA. Doc. 102 at 5. According to Rosenschein, the documents will enable him to "prove that NCMEC knew about every intimate detail of Microsoft's PhotoDNA program" and that NCMEC "affirmatively supported Microsoft's intrusive efforts to conduct warrantless seizures and searchers of millions of photographs that belonged to Internet users on a daily basis" in an effort to "side-step" the Fourth Amendment. *Id*. at 6.

Second, Rosenschein argues that the requested materials will support his *Franks* challenge to the affidavit filed by the Bernalillo County Sheriff's Office Detective Kyle Hartsock in support of the warrant to search Rosenchein's home. Rosenschein contends that the affidavit contains recklessly false claims that Chatstep reported the images, when the requested documents will show that in fact it was Microsoft that did so, and that those false claims were intended to "cover up" the detective's unconstitutional search of the images. Doc. 102 at 6. According to Rosenschein, the discovery will also show that Microsoft's PhotoDNA program, not Chatstep, was responsible for the discovery and reporting of the images at issue and will therefore "underscore Chatstep's very limited involvement here, contrary to the detective's sworn affidavit." Doc. 102 at 6.

At the April 4, 2019 motion hearing, Counsel for Defendant expanded upon this explanation of the materiality of the document requests.

### 3.   Analysis

As explained above, not all relevant evidence is material to the defense. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. at 682. *See United States v. Allen*, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994). *See also United States v. Agurs*, 427 U.S. at 109-10 ("[T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

In light of the foregoing, the Court concludes that categories C, D, F, and H of Rosenschein's requests are material. The Court will grant the motion to compel these documents.

With regard to category A, the Court finds that the request as written is overbroad. The first sentence of category A requesting "all correspondence" requests far more information than is likely to be material. However, the Court concludes that there is a reasonable probability that the materials requested in the second sentence of category A are material. Thus, the Court will grant the motion to compel disclosure of the materials described in the second sentence of category A only.

With regard to category B, Defendant argues that it goes to the heart of his contention that Microsoft is an agent of NCMEC, and therefore of the government. However, category B is so broadly written (and entirely lacking in temporal limitations) that it appears to be more of a fishing expedition than a request for material information. Further, there is no obvious way in which the Court could limit category B so that it complies with the law on discovery. Therefore, the Court will deny the motion to compel these documents.

With regard to category E, the Court finds that it is overbroad in that it requests some items that are not material. The request for "all documents, contracts, communications, memorandums, or notes of any kind" would apply to far more information for which there is a reasonable probability to affect the outcome of the case. Thus, the Court will narrow category E to include only <u>contracts</u> described in that paragraph.

With regard to category G, again the Court finds it to be overbroad in that it demands more documents than what has a reasonable probability to affect the outcome of the case. The Court will grant the motion to compel NCMEC's presentation materials for the specific presentation described in the request. However, the Court will deny the motion insofar as it pertains to "all drafts of those materials."

In light of the foregoing,

**IT IS THEREFORE ORDERED** that *Defendant Dr. Rosenschein's Motion to Compel Production of NCMEC Materials* [Doc. 57] is **GRANTED IN PART** and **DENIED IN PART** as more specifically described herein.

_____
**UNITED STATES DISTRICT JUDGE**