FILED

18 JUL 24 AM 11:45

KING COUNTY
SUPERIOR COURT CLERK

Honorable Susan J. Craighead
Trial Date: January 23, 2019
CASE NUMBER: 16-2-31049-4 SEA



IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

HENRY SOTO and SARA SOTO, husband
and wife and the marital community
composed thereof, SARA SOTO, as
guardian for her minor child CALUM
SOTO, GREG BLAUERT and SUSAN
BLAUERT, husband and wife and the
marital community composed thereof,

                              Plaintiffs,

    v.

MICROSOFT CORPORATION, a domestic
corporation,

                              Defendant.

No. 16-2-31049-4 SEA

DECLARATION OF REBECCA J. ROE
IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL

I, Rebecca J. Roe am one of the attorneys representing plaintiffs in this matter. I make this declaration based upon personal knowledge. I am over the age of 18 and competent to testify to the matters set forth herein.

    1. Attached hereto as <u>Exhibit 1</u> are true and correct copies of excerpts of the deposition of Suzanne Kinzer taken June 1, 2018.

    2. Attached hereto as <u>Exhibit 2</u> is a true and correct copy of a 5-page report prepared

DECLARATION OF REBECCA J. ROE
IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL– 1
663638.docx

SCHROETER, GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

EXHIBIT AD

1   by Robert Sizemore.

2       3.  Attached hereto as <u>Exhibit 3</u> are true and correct copies of excerpts of the CR

3   30(b)(6) deposition of Robert Sizemore taken June 1, 2018.

4

5       I declare under penalty of perjury under the laws of the State of Washington that the

6   foregoing is true and correct.

7       DATED at Seattle, Washington, this   **23rd**   day of July, 2018.

8

9                                  SCHROETER, GOLDMARK & BENDER

10

11

12                                  REBECCA J. ROE, WSBA #7560
                                       Counsel for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF REBECCA J. ROE
IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL– 2
663638.docx

SCHROETER, GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

EXHIBIT AD

1

<strong>CERTIFICATE OF SERVICE</strong>

2

I certify that I caused to be served in the manner noted below a copy of the foregoing

3

pleading on the following individual(s):

4

*Counsel For:* Defendant

5

Rebecca J. Francis
Lauren Rainwater

6

Robert J. Maguire
Davis Wright Tremaine LLP

7

1201 Third Ave, Suite 2200

8

Seattle, WA  98101-3045
laurenrainwater@dwt.com

9

rebeccafrancis@dwt.com
robmaguire@dwt.com

☐ Via Facsimile
☐ Via First Class Mail
☐ Via Messenger
☑ Via Email
☑ Via EFiling/EService

10

11

12

DATED:        July 24, 2018, at Seattle, Washington.

13

14

15

Lynn Alexander, Legal Assistant

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF REBECCA J. ROE
IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL – 3
663638.docx

SCHROETER, GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

<strong>EXHIBIT AD</strong>

# Exhibit 1

EXHIBIT AD

Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

HENRY SOTO, et ux., SARA   )
SOTO, as guardian for her  )
minor child CALUM SOTO,    )
GREG BLAUERT et ux.,       )
                           )
     Plaintiffs,           )  No. 16-2-31049-4 SEA
                           )
     vs.                   )
                           )
MICROSOFT CORPORATION,     )
                           )
     Defendant.            )

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF
MICROSOFT CORPORATION
SUZANNE KINZER

Taken at Schroeter Goldmark & Bender

810 Third Avenue | Suite 500

Seattle, Washington

DATE TAKEN:  June 1, 2018
REPORTED BY:  Mary A. Whitney, CCR - WCRL #2728

---

Page 2

```
 1
 2              APPEARANCES
 3
 4
 5   FOR THE PLAINTIFFS:   REBECCA J. ROE, ESQ.
 6         Schroeter Goldmark Bender
 7         810 Third Avenue
 8         Suite 500
 9         Seattle, WA  98104
10         (206) 622-8000
11         roe@sgb-law.com
12      and
13
14         BEN W. WELLS, ESQ.
15         Wells & Associates
16         106 East Gilman Avenue
17         Arlington, WA 98223
18         (360) 435-1663
19         ben@wellsinjurylaw.com
20
21
22
23
24   (Cont'd)
25
```

---

Page 3

```
 1
 2              APPEARANCES - (Cont'd)
 3
 4
 5   FOR THE PLAINTIFFS:   JOSHUA B. TRUMBULL, ESQ.
 6   (Telephonic)      JBT & Associates
 7         106 East Gilman Avenue
 8         Arlington, WA 98223
 9         (425) 309-7700
10         josh@jbtlegal.com
11
12   FOR THE DEFENDANT:   REBECCA J. FRANCIS, ESQ.
13         Davis Wright & Tremaine
14         1201 Third Avenue
15         Suite 2200
16         Seattle, WA  98101
17         (206) 622-3150
18         rebeccawright@dwt.com
19
20   ALSO PRESENT:     Henry Soto - (Telephonic)
21         Greg Blauert - (Telephonic)
22
23
24         -o0o-
25
```

---

Page 4

```
 1
 2   30(b)(6) DEPOSITION OF MICROSOFT CORPORATION
 3              SUZANNE KINZER
 4
 5
 6            EXAMINATION INDEX
 7   EXAMINATION BY                    PAGE
 8   Ms. Roe    ........................    6
 9   Mr. Wells  ........................  112
10
11
12             EXHIBIT INDEX
13   EXHIBITS FOR IDENTIFICATION        PAGE
14   No. 171  -  CPSS Wellness Program    103
15
16
17         CONFIDENTIAL DESIGNATIONS
18
19
20
21
22
23
24   (Cont'd)
25
```

EXHIBIT AD

Page 9

1    A. Uh-huh.
2    Q. And what are the organizations that many
3    HR professionals belong to?
4    A. Yeah --
5        MS. FRANCIS: Object to the form.
6        Go ahead.
7    A. It would be SHRM, professional human resource
8    -- I went through all the coursework for that -- but
9    I'm not an active participant. I have been in the
10   past.
11   Q. Okay.
12   A. Uh-huh.
13   Q. And when did you quit being an active
14   participant?
15   A. Probably about five years ago.
16   Q. Any particular reason why you stopped being
17   an active participant?
18   A. No. It translates pretty closely to when
19   my job became global, and the amount of work, the
20   level of travel and that kind of thing, so --.
21   Q. Okay.
22   A. Yeah.
23   Q. Is there another group that is kind of
24   recognized in the HR professional world?
25   A. Not that I'm aware of that comes top of mind.

Page 10

1    Q. And not that you've ever belonged to?
2    A. No.
3    Q. So, describe the organizational structure of
4    Microsoft HR. And a lot of the time period involved
5    here is 2008 to 2014, so I don't know how it's easiest
6    for you to do that --
7    A. Yeah.
8    Q. -- but we're just trying to get a broad
9    stroke look at it.
10   A. Okay. So, probably the best way to describe
11   that would be to start at the top. Kathleen Hogan
12   would be our executive vice president of
13   human resources, and under Kathleen's umbrella would
14   be the buckets.
15        Three of the biggest buckets would be
16   staffing, so hiring and staffing is one entity. You
17   had human resources, meaning we call that "HR," under
18   "HR" -- right? -- so that would be more of the
19   generalist work, but it also includes talent and
20   organizational development and leadership work. And
21   that's the most client-facing organization.
22   Q. All right.
23   A. Then you would have comp and ben,
24   compensation and benefits, and we think about
25   that because we think about it as total rewards,

Page 11

1    so --.
2    Q. Okay.
3    A. Uh-huh.
4    Q. And let me have a little clearer definition
5    of the focus, if you will, of the three big buckets.
6        "Staffing," what is their mission, if you
7    will?
8    A. So they would be working on the broader
9    Microsoft workforce planning, meaning hiring, internal
10   and external movement across the company.
11   Q. And how many people are currently
12   in the staffing bucket?
13   A. I don't know.
14   Q. Ballpark?
15   A. I don't know.
16   Q. All right.
17        And then let's talk about "entity."
18   Is that what you said is the second bucket? How did
19   you describe the second bucket?
20   A. No, the second bucket I said was
21   "human resources."
22   Q. And that's what we consider a human resources
23   generalist?
24   A. Part of it, right.
25   Q. Okay.

Page 12

1    A. There is a -- if you think of it by audience
2    in some way, you think about the managers and
3    employees who are supported by generalists, who are
4    coaching managers, performance management, policy.
5        Then you have leadership capability and
6    leadership team and leadership focus, and so that
7    includes succession planning, driving the talent
8    ROB -- rhythm of the business -- driving the people
9    priorities for the organization, so working closely
10   with the business on their people priorities.
11   Q. All right.
12   A. And at Microsoft it is -- we go through
13   various stages, and companies typically do, of where
14   that work sits, is it all with one team or do you
15   divide that work.
16        Because sometimes in the leadership bucket
17   you tend to get organizational development -- there's
18   a crossover there -- but that's all under human
19   resources.
20   Q. And what is the approximate number of HR
21   people in that bucket?
22   A. I think it's about 3,000.
23   Q. And are they all here?
24   A. Oh, no.
25   Q. Okay.

EXHIBIT AD

Page 45

1    A. We've changed it.
2         You know, I -- Denise was a very, very
3    fair leader, so I had come to CSS, and CSS is where --
4    it's customer support, so they have a lot of empathy
5    for people -- right? -- I had come from engineering,
6    and so this is the most people-oriented business that
7    you could support at Microsoft, in my opinion, and I'm
8    still in services.
9         Denise cared deeply about her people,
10   so that conversation was hard, hard in a sense that
11   she didn't feel good about giving anybody no
12   rewards -- right? -- and so -- so it being forced or
13   feeling like there was guidance, even if it was
14   recommended guidance, if there was an exception,
15   we could have gotten an exception, right?
16        But it's hard. That's a hard conversation
17   to have with your people -- right? -- and you know
18   some of those messages are not going to land well.
19   It's not an easy decision as a leader.
20        So the model that we have now, I love --
21   I appreciate the fact that it's stuck, but I think as
22   a business you're going to continually transform.
23   I mean, we've learned -- right? -- around, you know,
24   growth mindset and being more of a learning, agile
25   company, and so our performance and rewards,

Page 46

1    you know, this should reflect that.
2         Q. And when did you change it?
3         A. We changed it at least three years ago.
4         Q. 2015ish?
5         A. Uh-huh.
6         Q. How do you account for issues -- you said
7    like in the ranking that the manager -- or in the
8    score --
9         A. Uh-huh.
10        Q. -- in the preliminary score, that the manager
11   was supposed to consider issues, like if the person
12   was a new-hire or if the person had been on an LOA,
13   something like that.
14        Tell me how that worked, how that was
15   supposed to work.
16        A. Uh-huh. So the manager would go through
17   training in preparation for rewards, and so -- we have
18   all managers go through a preparation training --
19   so it's included in that training -- on how to manage
20   various populations such as that. There's a few that
21   we identify that we look at.
22        So the manager would be trained, and then
23   if there's a lower in the organization calibration
24   discussion, we don't sit in on -- as HR we don't sit
25   in on all of those, but certainly at Denise's level

Page 47

1    Denise and I would look at it.
2         Q. But I'm talking about at that very first
3    level --
4         A. Uh-huh.
5         Q. -- the first level or the calibration
6    meetings, describe, please, the training that the
7    managers are given about how they should factor in --
8    I don't know what you would call it -- special
9    circumstances or issues like that.
10        A. Yeah -- yeah. So they go through a training.
11   At the time we used to deliver trainings as -- our
12   scope was not as big, our client groups were smaller,
13   and so we, as a team, a CSS HR team, we would
14   deliver those trainings, so we would deliver rewards
15   training prep sessions. So the managers would attend
16   that.
17        Typically -- and I believe in the time
18   when we delivered those -- that training for CSS,
19   there's actually at the back of it scenarios that are
20   built out. For example: Here's how you think about
21   a new-hire. Here's how you think about someone on
22   LOA. We have what we call college hires. We call
23   them mocks.
24        Q. All right.
25        A. So -- yeah, so walk them through real

Page 48

1    life examples. Are they going to catch everything?
2    They may not. Right? It's -- you know, they're
3    humans too. That's why we do scrubs at the upper
4    level.
5         Q. What are scrubs?
6         A. I call them scrubs. It's basically looking
7    at the review model, the rewards model, and that's
8    what I was saying with Denise, right?
9         So in that meeting you can very easily
10   pivot by those who were just hired in January,
11   you know, and they only have three months of reward
12   time to -- you know, six months for rewards.
13        That's what I call a scrub, just scrubbing
14   the data -- looking through to make sure just from
15   a -- I didn't know the people, but I can certainly see
16   a name and I can see a hire date -- right? -- and say,
17   Wow, person got a 5 -- right? -- and that's probably
18   not right, so I could question and have the business
19   revisit that.
20        Q. Okay.
21        A. Uh-huh.
22        Q. How would know if somebody had been on some
23   kind of a -- perhaps a reduced schedule for specific
24   reasons, how would you know that --
25        A. So --

12 (Pages 45 to 48)

EXHIBIT AD

## Page 49

1    Q.  -- or would you?
2    A.  I would only know if they were part-time.
3    If it was in the system that they were part-time,
4    leave of absence is a list we always look at, that
5    it's pulled for us, so --.
6    Q.  But if there were other sorts of special
7    circumstances affecting, you know, for instance,
8    the quantity of work, those issues you wouldn't know?
9    A.  No.
10   Q.  But you would expect the manager to know
11   those things and factor those things --
12   A.  Yes.
13   Q.  -- into their ranking, wouldn't you?
14   A.  Yes.
15   Q.  This CSS HR training, is there a deck that
16   goes with that?
17   A.  Every year at the company level we have
18   a rewards deck that's prepared for managers, so we
19   just take that -- if there's anything specific for our
20   business we might add that in, but its contents is
21   given to us from what we call the center, and
22   so we don't create that ourselves, but it's
23   Microsoft-approved content that we would use.
24   Q.  And would you have that document from 2013?
25   A.  I have -- I do.  I have a deck.

## Page 50

1    Q.  Perfect.
2    And then do you actually sit down in a
3    meeting with the managers and present the deck --
4    a deck's a PowerPoint, isn't it?
5    A.  It's a PowerPoint.
6    Q.  All right.  Do you sit down and go through it
7    with them and have a discussion about it?
8    A.  They are virtual, so -- we don't have
9    everyone in Redmond, and so most of our trainings are
10   virtual.  The deck I have is not the actual training.
11   I have a deck from a calibration meeting that they
12   would use.
13   Q.  Ah.  Okay.
14   A.  Uh-huh.
15   Q.  Can you tell us where there might be a 2013
16   deck from a training?
17   MS. FRANCIS:  Object to the form.
18   A.  I might -- somebody might have it.  I don't
19   know.
20   Q.  I assume HR has a repository of decks, decks
21   and docs?
22   A.  Not with us individually.  You know, with HR,
23   I don't have decks that far back, so -- we get new
24   laptops and -- you know, so --.
25   Q.  Okay.

## Page 51

1    A.  Yeah.
2    Q.  So, let me ask you --
3    MS. ROE:  You're looking at your watch.
4    Do you want to take a little break?
5    MS. FRANCIS:  I just want to run to the
6    restroom real quick.
7    MS. ROE:  Okay.
8    MS. FRANCIS:  Is that okay?
9    MS. ROE:  Sure.
10   (Brief recess taken.)
11   Q.  (By Ms. Roe)  Ms. Kinzer --
12   A.  Yes.
13   Q.  -- this document, if you would turn to
14   page 4 -- and I think it's Exhibit-151 -- this is the
15   subpoena that we sent to Microsoft, and they indicated
16   to us that you were going to speak to the points
17   raised in 6, in topic No. 6 --
18   A.  Uh-huh.
19   Q.  -- and the following subsets, and I can't
20   read upside-down.
21   So I guess my question is this.
22   Is that what you understood and is that what you
23   prepared for?
24   A.  I'd have to look at each of these to say yes,
25   but -- I assume so, but I don't know.

## Page 52

1    Q.  Okay.
2    A.  Okay.
3    Q.  Let's go back and talk for a moment about the
4    things that you did review.  Give us a description of
5    what kinds of documents you reviewed.
6    A.  So, the summary plan of benefits back from
7    2013, in case there were any changes, an overview, and
8    a number of emails with Greg and some with Henry.
9    Q.  All right.
10   A.  There was also a deck, so to speak, on --
11   it was 2008, an older deck, about -- and it looks like
12   a presentation by someone about the on-line safety
13   team.
14   Q.  Do you know who did that?
15   A.  I don't.
16   Q.  Was there just that one deck that you looked
17   at?
18   A.  Yes.
19   Q.  Did you look at any other materials related
20   to specifically the on-line safety team?
21   A.  Yes.  The form that -- I wouldn't call it
22   a consent, but there's a form that was signed by
23   Greg Blauert regarding acknowledging the content
24   he was reviewing and the scope of the job.
25   Q.  Anything else?

EXHIBIT AD

Page 57

```
 1        A.  So, as part of my entry orientation into the
 2   group, I meet with all the managers, and so I would
 3   have met with Renee Yochum, who reports to -- who
 4   reported to Denise at the time, Stephen Sorensen, who
 5   reported to Renee, and Tammy Fairbanks, who reported
 6   to Stephen.
 7        In talking about the wellness program,
 8   we didn't go into detail, into deep detail.  At the
 9   time it was working was my understanding.  Stephen
10   had more than just -- not just, but he had more than
11   the on-line safety team as his remit, so it was part
12   of that, whereas, Tammy, that was a her team.
13        Q.  And she told you she believed that it was
14   working?
15        A.  Yes.
16        Q.  Do you recall anything more she said about it
17   than that?
18        A.  I don't.
19        Q.  And you don't recall any details she gave you
20   about the wellness program?
21        A.  I don't.
22        Q.  What, if anything, did she tell you -- well,
23   let's go back.
24        What, if anything, did any of the people
25   that you met with -- Denise Rundle, Renee Yochum,
```

Page 58

```
 1   Stephen Sorensen or Tammy Fairbanks -- tell you about
 2   their understanding of the potential harmful impact of
 3   viewing this content?  Did any of them tell you
 4   anything about that?
 5        A.  I believe so.  I believe it was back to sort
 6   of Denise's -- her response and he personal impact on
 7   employees, yes, and so she would have shared that.
 8        We were trying to give them -- I remember
 9   her saying, "We're giving them ..." -- it was probably
10   Tammy, not Denise -- Tamara -- "We're giving them ..."
11   -- included in this wellness program, Tammy had
12   complete flexibility to do what she needed to support
13   that team at the time.
14        My understanding is they could go home
15   early if needed, they had a counselor available --
16   they also had the Microsoft benefits -- and so I don't
17   think it was lost on anyone how incredibly hard these
18   jobs were and seeing this content is.
19        Q.  Did any of those four people -- and we'll
20   limit the conversation for the moment to those four
21   people -- tell you who owned responsibility for making
22   sure that the employees performing content moderation
23   were safe?
24        MS. FRANCIS:  Object to the form.
25        A.  Can you rephrase the question.
```

Page 59

```
 1        Q.  Did any of those people tell you or did you
 2   gain a sense that any of those people owned the
 3   responsibility for making sure that the on-line safety
 4   content moderators were working safely?
 5        MS. FRANCIS:  Same objection.
 6        A.  No.  They would -- as managers of the
 7   business, I would assume that they would -- so they
 8   were working with benefits, working closely with
 9   benefits -- right? -- to get this program set up.
10        They would be using all the resources that
11   we made available to them, and they -- so they did --
12   but they didn't discuss that with me, I own this.
13        Q.  Did you hear any discussion from any of
14   those four people about the training they had received
15   regarding the potential impact of viewing this
16   content?
17        A.  I did not.
18        Q.  Did you ever learn whether or not
19   there was any training of the managers about how
20   to make sure that they were keeping their employees
21   safe?
22        A.  Not specifically.  I believe -- if I recall,
23   Tammy would have gone through -- I think she talked to
24   me about training, herself, because she's the manager
25   of the team.
```

Page 60

```
 1        At the Stephen Sorensen level they would
 2   -- I think they would be using the skills that we
 3   train managers across the company, you know, to be
 4   sensitive to an employee's concerns, when to go
 5   absolutely to benefits, when to use HR, go through HR
 6   to get to benefits immediately.
 7        If there was a -- you know, if there's
 8   a medical concern, to look for -- you know, to have
 9   open dialogue and honest, trusting teams so that
10   people feel comfortable raising a concern if they have
11   one with their manager.
12        It's up to the manager -- or the employee
13   to disclose that with the manager.  The manager then
14   has an obligation to respond.
15        Q.  All right.
16        A.  And we had taken them through -- there was
17   training that myself and my peers and CSS ran the
18   month of April and May --
19        Q.  Of what year?
20        A.  2013.
21        Q.  Okay.
22        A.  -- which was around managers' obligations,
23   and it's called Managers and the Law, basically.
24        It's when to involve HR -- when to always
25   go to HR and then when to involve HR, and obviously if
```

15 (Pages 57 to 60)

EXHIBIT AD

Page 61

1   it's involving HR, meaning myself, we didn't --
2   they didn't have to worry about who to go to, they
3   could have come to me to get to benefits or they could
4   go directly to benefits, right?  Benefits are there
5   for them.
6           If it's involving me, it might be
7   coaching, performance management, you know, they're
8   having difficulty with -- you know, with a coaching
9   scenario or something like that.
10          If they need to involve and -- absolutely
11  have HR involved, it would be if they -- if there's a
12  medical issue that's impacting their performance, if
13  an LOA is needed, a leave of absence, if there's a
14  violation of policy, if they suspect, you know, drugs
15  and alcohol are involved.
16          Certainly if they're going to go to
17  termination, it's a good habit to partner with HR.
18  They do not need to.  They don't need to, they can
19  do it on their own.
20  Q.  Let me ask you this.  If managers believe
21  that an employee might be under the influence of
22  drugs or have some sort of alcohol issue that was
23  affecting their performance, were they supposed to
24  go to HR?
25  A.  Yes.

Page 62

1   Q.  Why?
2   A.  They would go -- if they would reach out to
3   me -- I happened to be the closest -- right? --
4   and the most visible physically, so if I think of
5   myself as a triage, they come to me, and then the --
6   because it could be impacting, there could be medical
7   issues involved, we'd want to get them to, like
8   I said, that firewall and get them to an expert in the
9   business of benefits at Microsoft.
10          So then they would step in and help,
11  you know, from the employee perspective, and I could
12  continue to coach the manager on -- you know, work on
13  their performance, manage their performance separate
14  from the medical issue.  We leave that to the experts,
15  and that's my benefits partner.
16  Q.  So, if a manager believed one of their
17  employees' performance was being affected by a drug
18  or alcohol issue, they were required to go to HR, who
19  would in turn refer them to benefits?
20  A.  Yes.
21  Q.  This training you mentioned, Managers and the
22  Law, or something like that --
23  A.  Uh-huh.
24  Q.  -- was that another virtual training?
25  A.  Yes.

Page 63

1   Q.  And is that also a deck?
2   A.  It was, yes -- I mean, it -- yeah.  We had
3   a deck then, yes.
4   Q.  Were you involved in these virtual training
5   sessions?
6   A.  Yes.
7   Q.  And what were the circumstances where
8   a manager must go to HR, other than a suspected drug
9   and alcohol issue?
10  A.  Uh-huh.  The reason we did the training at
11  that time of year is because we're heading into
12  rewards, and so that's typically a highly emotional
13  time, too, for employees.
14          We prepare them on coaching, we prepare
15  them on performance management, prepare them on a
16  number of different issues, and then there is, say,
17  part of the presentation that is around -- that's what
18  I was talking about before -- when to involve HR and
19  when to absolutely always go to HR.
20  Q.  And what is the always-go-to-HR category?
21  A.  The always-go-to-HR was -- well, I think what
22  I was saying was the employee is stating that there
23  is a medical issue that's impacting their performance,
24  right?
25  Q.  Okay.

Page 64

1   A.  The employee might need to go on a leave
2   of absence, they mention leave of absence or some time
3   away, and it could be drug-and-alcohol-related or
4   it could be a policy violation.
5   Q.  So those are the three, for lack of a better
6   term --
7   A.  Four.
8   Q.  -- four, for lack of a better term, mandatory
9   reports --
10  A.  Yeah --
11  Q.  -- mandatory HR reports?
12  A.  The slide says, like, "Always go HR."
13  Q.  All right.
14          What did the coaching indicate to do if a
15  manager was concerned that there was an issue that may
16  be affecting the employee's performance that perhaps
17  the employee didn't recognize?
18  A.  So, the manager, to be curious, to ask
19  questions, you know, of the employee:  Is there
20  anything that's impacting your work?  Is there
21  anything -- you know, any additional support you might
22  need.  They could then send them to MS Cares, which is our
23  employee assistance program, but it's really to be
24  curious.
25          The employee still has the obligation

EXHIBIT AD

Page 73

1   open job to go find it, but, you know, our policies
2   are pretty clear on HR Web about internal transfers
3   and applying for roles and --.
4        So the manager is the first point of
5   contact for that, for them to, you know, have that
6   conversation, but we -- we'd all be accessible to the
7   employee, whether it was Steve or myself or the
8   managers and the -- whoever the employee felt
9   comfortable going to.
10      Q.   During the time you were there, did
11   anybody from the on-line safety team ever call you
12   and tell you they needed help finding a new job?
13      A.   I don't recall that, no.
14      Q.   And have you looked and investigated to see
15   if anybody else came to HR and said, I need you guys
16   to help me find a now job?
17      A.   No.
18      Q.   Okay.
19      A.   I recall a conversation with Tammy that
20   was -- we were talking about the team, and we were
21   talking about how long is a good length of time to
22   stay on that team.
23      I also know she had had a conversation --
24   if I recall, she had had a conversation with Greg
25   about, you know, maybe do you move off to another role

Page 74

1   and -- besides just pulling him out of content, is it
2   time to look for a new role, and what she shared with
3   me was that Greg said, "No, I don't want to do that,
4   because then somebody else would have to take my job."
5   And it was really powerful. I remember that to this
6   day.
7      Q.   Let's talk a bit more about that.
8      A.   Yeah.
9      Q.   Tell us everything you remember about this
10   conversation.
11      A.   Uh-huh. So, I remember talking with Tammy,
12   and she had caught me in the copy room, and I --
13      Q.   When would this have been?
14      A.   I believe this would have been -- I don't
15   recall the exact month, but it would have been before
16   -- before the rating of -- the low rating would have
17   come in, because -- I know that because I would have
18   asked a little bit different questions.
19      My questions would be, if I had known
20   that -- so that's why I'm thinking it was probably May
21   or June or July, prior to the rewards conversation.
22   The reason being is if someone is a 5 in the old
23   system, I would ask are there competencies -- apart
24   from the content, are there competencies that we're
25   seeing, needing improvement, and you coach them on

Page 75

1   those, and have they turned it around so that,
2   you know, they would be successful in another role at
3   Microsoft, or is just like -- is it something that
4   would be true of any role at Microsoft.
5      Then we'd say, you know, it's probably not
6   a good idea to go to another team, so that's why
7   I'm thinking it was probably before that, that the
8   conversation she had with me --
9      Q.   I was just going to say, so you think it was
10   around May, June or July.  Is that your testimony?
11      A.   Yes.
12      Q.   All right.  And was this the first
13   conversation you had had with her like that?
14      A.   Yes.
15      Q.   Was it the only conversation you had with her
16   about anything like that?
17      A.   About Greg specifically, yes.
18      Q.   And had you spoken with her --
19   and I'm not asking you to identify who -- about any of
20   the other people on her team having difficulty with
21   content?
22      A.   No.
23      Q.   So is this the one and only conversation you
24   had with Tammy Fairbanks about an employee having
25   difficulty with content?

Page 76

1      A.   That I recall.
2      Q.   And that is Greg.  So it was a conversation
3   you recall about Greg Blauert?
4      A.   Yes.
5      Q.   And you recall you were talking with her when
6   she caught you the coffee room?
7      A.   Copy room.
8      Q.   Copy room.
9      A.   Yeah.
10      Q.   Go ahead and tell us what you recall about
11   the conversation.
12      A.   It was Greg's concern about his role in that
13   team, that he had been pulled out of some of the
14   content I think since February, so a short period of
15   time he had been pulled out but still was struggling.
16      And so I had said, "Well what if we
17   consider rotating those people out, right?  You go to
18   another job, how long can you actually -- you know,
19   how long is good to stay in that role?"
20      She said, "Well, I actually talked to Greg
21   about that, and Greg said, 'I couldn't move
22   because that would mean somebody else would have to
23   take this job'."
24      Q.   And I think you indicated that that had an
25   impact on you.  In what way?

EXHIBIT AD

Page 77

1    A.  It did, because I was visualizing someone
2    being in those roles for ten years, you know, but at
3    what point -- you know, it can't help but impact
4    you -- right? -- and so -- and she was also describing
5    the team and that the team cohesion was really
6    important, so having the support of the team was
7    critical and that dynamic of the team, so it seemed to
8    work.
9         But I know I had a question in my head,
10   thinking, you know, Wow, I'm surprised he wouldn't
11   want to -- he could move -- right? -- to another role.
12   Q.  Okay.  You say he could move to another role.
13   Again, what is the basis for your statement?
14   A.  That using our -- it's an open-door policy at
15   Microsoft, so -- and you can apply for other roles
16   at any time, so he could have done that, and we would
17   have absolutely supported that, you know, if he had
18   come to us with that.
19   Q.  And how did this conversation start?
20   A.  It started with Tammy approaching me to
21   talk about him, talk about Greg, and the conversation
22   she must have been having with him.  That's what I can
23   recall.
24   Q.  Do you remember kind of like what her lead-in
25   was?  Because you didn't know Greg, then, right?

Page 78

1    A.  Huh-uh -- huh-uh.
2    Q.  You had one meeting with Tammy, correct?
3    A.  I don't recall.
4    Q.  Well, you didn't know her very well, did you?
5         MS. FRANCIS:  Object to the form.
6    A.  No.
7    Q.  And when did you say you got there?
8    A.  April.
9    Q.  Of 2013?
10   A.  Yes.
11   Q.  So you had been there a month?
12   A.  Yeah.
13   Q.  All right.  So she catches you in the
14   copy room, and what do you recall her saying to
15   introduce this topic?
16   A.  It was sort of in passing and so -- but it
17   was wanting to talk a little bit about Greg.  That's
18   all I recall.
19   Q.  And she used his name?
20   A.  I don't recall.
21   Q.  Well, you used his name, so I'm trying to
22   figure out if she hadn't used his name, why you were
23   using his name.
24   A.  I was saying she did not -- I don't know if
25   the conversation started with her saying, I want to

Page 79

1    talk about Greg or, There's a situation I want to talk
2    about.  I don't recall that.  But the topic was Greg,
3    so it -- you know.
4    Q.  And you knew at that point in time that
5    somewhere during the course of this conversation his
6    name came up?
7    A.  Yes.
8    Q.  All right.
9         So she said she had talked to him,
10   and then you asked about rotating him out,
11   and she indicated that he didn't want to move because
12   then someone else would have had to come and do that
13   job?
14   A.  Yes.
15   Q.  And you remember that distinctly?
16   A.  Yes.
17   Q.  What was your reaction to that?
18   A.  My reaction was -- and that's what -- the
19   follow-up conversation was around the team dynamics
20   and helping to understand, Why would that -- you know,
21   Why would that be?  That's really interesting.  So it
22   was me thinking, you know, I probably don't quite
23   understand the dynamics of what that is in working on
24   that team.
25        You know, that's when she described the --

Page 80

1    It's a unique team, they rely on each other, and so I
2    was, like, Oh, okay.  So if you take one person out,
3    it disrupts the team dynamics, and these folks are
4    dedicated professionals to this business.
5         Knowing Denise's passion about it,
6    that's the way they described it to me, is this is
7    work that they were -- they were absolutely dedicated
8    to doing.
9    Q.  Did it cross your mind to look at whether
10   or not this might be, for lack of a better term, a red
11   flag for somebody who really should come out, whether
12   they recognized it or not?
13        MS. FRANCIS:  Object to the form.
14   A.  No, it didn't, because the -- what I did was
15   coach the manager -- right? --that this is always an
16   option for them and we could help, and then it's up
17   to her to ensure that she's having conversations with
18   the employee.
19        So there was no other action at that point
20   except to, you know, check back in in the next
21   one-on-one I would have with her:  How's it going with
22   the team?  Are you having further conversations with
23   Greg?
24        But that was when I was pulled to doing
25   the reorg and we had actually had Zoe come in, so I'm

EXHIBIT AD

Page 81

1   -- I don't recall another one-on-one with Tammy, but
2   we were in the same building -- close to the same
3   building, and so I would see her for sure.
4        Q.  Okay.
5        A.  Uh-huh.
6        Q.  Did you have a conversation -- I'm sorry.
7            Did you make any kind of notation
8   of this interaction that you had with Tammy about
9   Greg?
10       A.  Written?
11       Q.  Yes.
12       A.  I don't recall.
13       Q.  Because we've heard a lot of people
14  complaining about the fact, It's five years later and
15  you're asking me to remember things, and you seem to
16  remember this conversation pretty clearly.  At least
17  you're reporting that you do.
18           Have you looked at anything to
19  refresh your recollection about this conversation?
20       MS. FRANCIS:  Object to the form.
21       A.  Not about this.  There's nothing written.
22       Q.  So it actually sounds like what really
23  happened is you were brand-new at this job, and while
24  you might have under other circumstances dug a little
25  deeper into it or circled back with Tammy, there was a

Page 82

1   lot on your plate, so you moved on?
2        MS. FRANCIS:  Object to the form.
3        A.  I wouldn't agree with that statement because
4   there was -- it was my responsibility -- right? -- and
5   so I would make sure the managers had the tools and
6   that they would come to me, proactively, if there had
7   been -- if there was a situation -- right? --with an
8   employee.
9        Q.  Did you have any other conversations
10  with Tammy Fairbanks, that you recall, including about
11  her own issues surrounding viewing content?
12       A.  I know I did.  I can't recall the specifics
13  of the --.
14       Q.  Why is it you think you recall the specifics
15  of the conversation with her about Greg?
16       MS. FRANCIS:  Object to the form; asked
17  and answered.
18       A.  Because it struck me emotionally.  I was new
19  to the organization and again, like I said, I never
20  knew that Microsoft was in this business, and so
21  logically it just didn't make sense to me.  That's why
22  I remember.
23           I think I remember because it was the copy
24  room, too, so -- because it wasn't my office,
25  it wasn't a call, it wasn't a regular -- you know,

Page 83

1   it was more of a drive-by, and so --.
2            She was new to Microsoft, and she was
3   learning to be a manager, as well, and so making sure
4   that we -- I was working with Stephen.  Stephen's a
5   very -- you know, he's a very conscientious manager,
6   and so he would often answer the way I would answer
7   things anyway.
8            I mean, she had an amazing support system,
9   you know, with Stephen, Renee, Denise, all the way the
10  chain, of folks that are really very caring -- right?
11  -- and empathetic leaders.
12           So I -- I mean, that one conversation
13  stands out to me.  I know I had other conversations
14  with her because I just -- I picture her -- I can
15  picture her in the hall and -- I think we passed
16  getting coffee or, you know, whatever, and so
17  there probably little snippets of conversations
18  here and there.
19       Q.  Okay.
20       A.  So, for me to say I never had any other
21  conversations or meetings with her, it wouldn't be
22  accurate.
23       Q.  I think we were at -(h), 6(h), on page 5, and
24  apparently accessibilities management might not be a
25  term you're --.

Page 84

1            DoD, have you heard of that?
2        A.  Department of Defense?
3        MS. FRANCIS:  DAD, disability answer desk.
4        (Discussion off the record.)
5        A.  That was after my tenure.
6        Q.  "All reports OST or accessibilities
7   management made to HR employee safety recommendations
8   to improve OST or accessibility from the HR
9   perspective."
10           First of all, what did you do to try
11  to familiarize yourself with the Microsoft history on
12  this issue?
13       A.  Uh-huh.  So there were a couple of emails,
14  one or two, from Jenny Lay-Flurrie, so -- and she had
15  come in after my tenure -- we passed in the January
16  time frame -- and so I know that she -- if I recall,
17  she was -- in her onboarding she probably would have
18  been onboarded into what this team does.
19           She was like the -- at her -- when I think
20  about her level, I think she probably -- I don't know
21  at the time Stephen reported to her.  I'm not sure
22  what that was.
23           However, there were emails with her
24  looking into the -- like, a signed consent, and
25  my guess is -- I mean, she's our accessibilities --

EXHIBIT AD

# Exhibit 2

EXHIBIT AD

## Policy Overview

**"When in Doubt" Policy:** In October 2012, the Online Safety Team began the adoption and development of a new policy (a) to ensure content reported to NCMEC was, in fact, illegal child sexual abuse material and (b) to reduce the risk a customer's account was shut down in error.   This policy was implemented over the course of 2013.

There were three primary reasons for this decision:

- First, there were occurrences where a customer's account was closed because content was incorrectly identified as illegal child sexual abuse material, and Microsoft wanted to reduce the possibility of errors.
- Second, Microsoft wanted to improve the accuracy of its submissions to NCMEC to ensure that NCMEC received actionable information and was not flooded with inaccurate reports (the latter of which strained NCMEC resources).  Ensuring and improving quality of NCMEC reports would also better allow NCMEC and law enforcement to action reports within the statutorily-allowed time frame for holding suspected CSAM.
- Third, while Microsoft has always been committed to fighting CSAM on its services, it realized that commitment must be balanced against a customer's expectations of privacy in their private folders.  Reducing false reports and erroneously shutting down accounts would further Microsoft's efforts to both fight actual CSAM and uphold customer privacy.


**Forensic Investigations:** In Fall 2010, members of the Online Safety Team raised the idea to conduct "forensic investigations" into accounts where CSAM was found.

- Impetus for the project started with the Online Safety Team. Team members wanted to investigate accounts already identified as violating terms of use to: 1) locate additional potentially illegal images within accounts; 2) identify accounts where the images came from and search through those account; and 3) identify accounts that received the images and search through those accounts.
- Microsoft understands that Online Safety Team manager Jan Clausen supported the idea of Forensic Investigations, but higher-level managers were not as supportive.
- The Online Safety team worked on implementing a pilot forensics project by winter 2010 – 2011, which later evolved into a more fulsome forensics program.
- Eventually, forensics work shifted to  the vendor in Manila.

The forensic investigations program went beyond what was required by the law and raised concerns regarding customer privacy.  With customers, including businesses, storing increasing amounts of data in the cloud, it was important to maintain confidence in the security and privacy of that data.  By May 2014, Microsoft formalized  a policy for Child Sexual Abuse Material (CSAM) Detection & Reporting, in which Microsoft recognized a customer's expectations of privacy and security when storing data in Microsoft's cloud. Forensic investigations by the company ended with the recognition that such investigations could and would be handled by appropriate law enforcement agencies based on the probable cause established through Microsoft's NCMEC reports.



EXHIBIT AD

**Moderation of Private Content:** Over the years, Microsoft's approach to moderation of private content involved both automated scanning and active human review.  By 2012, Microsoft realized active moderation of private folders in OneDrive and the forensics investigation project were not going to be scalable and with increasing use of cloud storage, risked violating customer privacy rights and expectations.  Microsoft became aware that actively investigating private folders where the customer had not shared content risked transforming it into an agent of the state and subjecting it to Fourth Amendment limitations, which could result in the exclusion of evidence needed for prosecuting individuals who possessed CSAM.  After significant consideration, Microsoft determined that to protect its customers and scale the business in a manageable way for Microsoft employees and vendors, it would cease actively scanning private folders in OneDrive while continuing to scan public folders and images shared from private folders to others:

- In October 2012, active moderation in private folders on Skydrive ended.
- As a result of the policy change formalized in May 2014, all moderation of private content ended, including PhotoDNA scanning of private folders.

The effect of these policy changes was to reduce the amount of employee and vendor exposure to CSAM and other graphic or disturbing content.

## Tools Overview

The Online Safety Team has used a variety of tools over the years, which have evolved and improved as time has gone on. These tools are aimed at handling Terms of Use (TOU) violations for a variety of products. The implementation and/or deployment of a particular tool depended on the content involved along with the TOU associated with the product. Depending on the maturity level a product allowed, the TOU may need to be supported differently than another product or service. As such, the Online Safety Program Managers worked as consultants and in concert with products to identify tools needed and/or changes to be implemented to enforce the TOU.

**PhotoDNA:** This tool takes hash values from images that are known to be illegal Child Sexual Abuse Material (CSAM) and scans Microsoft's platforms for those same hash values, allowing Microsoft to efficiently identify and remove known CSAM.  Microsoft began developing this technology in 2008 with Professor Hany Farid, from Dartmouth, in a joint effort to help NCMEC solve the rise in CSAM that accompanied the growth in internet services and platforms.  It took Microsoft and Professor Farid a year to develop PhotoDNA.  It was a groundbreaking technology that allowed Microsoft, NCMEC, and others in the industry to detect and remove from the internet millions of CSAM images per year.

- Microsoft donated PhotoDNA to NCMEC in December 2009.

EXHIBIT AD

- PhotoDNA was first launched on Microsoft platforms in May 2010 with OneDrive (formerly SkyDrive), and its use was expanded to Microsoft's various platforms over the years.
- In May 2011, Facebook began using PhotoDNA. It was the first technology company other than Microsoft to use it.
- In 2011, members of the Online Safety Team proposed expanding PhotoDNA to other types of terms of use violations, including adult images, spam, and violent images. That proposal was not adopted.
   o Reason PhotoDNA for other content types was not adopted included: 1) complexity of implementation, 2) lack of clarity or consensus on how Online Safety would generate a trusted database of known hashes for these other content types, and 3) technical difficulties to effectively implement at scale.
   o No manager rejected the idea outright, but the team was asked to provide concrete costs and benefits for implementation along with further technical specifications on how it could be effectively applied across different types of content.
- In 2012, members of the Online Safety Team proposed expanding the current hash database to include hashes from industry partners. In 2013, a preliminary test was initiated with Facebook after the development and adoption of the classification matrix; however, the results were not promising because there were too many false positives, and the program was not adopted.
- In late 2012 and early 2013, members of the Online Safety Team proposed expanding the hash database to include CSAM identified by the team during its content reviews. While the proposal was not initially adopted, as it was determined that additional elements would be required given in part the results from the preliminary test with Facebook's hash sharing initiative, the proposed concept continued to receive focus, with eventual development and deployment. In 2014 the Microsoft PhotoDNA Cloud Service launched, followed in 2016 by the deployment of the Microsoft Hash Database across numerous products.

**Integrated Online Safety Engine:** This tool was proposed as a means for handling all types of abuse reports from customers and products, coupled with a policy engine that would potentially dictate how to handle the content per line of business (e.g. Skydrive, Bing, MSN). In theory, IOSE would have allowed an agent to tag an image as CSAM or terms of use violation forever, meaning the image would keep that tag regardless where it showed up in Microsoft's services or platforms. In theory, this could have reduced agent need to re-review the image when it appeared in a different platform at a later time.

- IOSE was proposed in May 2010 by the Online Safety Team and was subsequently discussed on and off from 2010 to 2012, but it never came to fruition.
- IOSE was never developed for a number of reasons: 1) it was not designed or technically structured to scale to the sheer volume that services were increasingly experiencing or the variety of services coming online; 2) there was a failure to provide concrete technical specifications needed for an engineering team to engage, including how or whether new and drastically varying platforms and products could be effectively and efficiently connected to IOSE, what would be required to maintain and update IOSE, or how or whether it could be scaled to the incredible growth in internet-based services (growth in terms of variety and

EXHIBIT AD

usage); and 3) lack of detail on the implementation costs and benefits, including lack of detail on how much storage space it would require, whether it would require storing actual images or just hashes, whether/how Microsoft could store actual images without violating laws prohibiting storing and distributing CSAM.

- No manager rejected the idea outright, but it fizzled out over time because the Online Safety Team was unable to show that it was technically feasible or scalable.
- While the tool was never developed as proposed by the team, there were similar solutions that were developed and deployed over this same time by Microsoft. These solutions were 1) Report Abuse Violation (RAV) in 2013 as a centralized process for customer reported TOU violations, and 2) the Marketplace CVS service that included a suite of automated content scanning tools, which Microsoft started developing in 2012, with yearly improvements and expansions in services over the years, including a video classifier in 2014.

**Classification Matrix:** This "classification matrix" or "content ranking matrix" was developed to provide a ranking and classification system for Child Sexual Abuse Material with specific definitions and has been shared with others in the industry.

- Matrix was developed in November 2012 and appears to have been developed in response to the "when in doubt" policy change, so that more definitive determinations could be made on how to classify images. The Matrix was implemented over the course of 2013.
- Sharing with the industry was seen as a positive first step to effective and efficient hash collaboration.

**Other Tools:** The Online Safety Team has used a variety of tools over the years, including:

- **Unified Admin Tool (UAT)** – used to review and report images to NCMEC. In September 2009, UAT received an update for Windows Live SkyDrive. The update (a) consolidated all images for Spaces, Profiles, and SkyDrive into the SkyDrive UAT, resulting in less complicated workflows, cost savings, and reduction in redundant agent work; (b) changed the way agents viewed files in WL SkyDrive by including a thumbnail of the image so that agents could quickly check the image without having to click on each one and view in full screen; and (c) gave agents a button within WL SkyDrive to file reports with NCMEC for users who didn't have an account in WL, so that agents no longer had to create a dummy WL space to file the report. This last change allowed for more detailed reports to NCMEC and ultimately, law enforcement. Over the years the UAT tool continued to be updated as bugs were fixed and SkyDrive/OneDrive was updated.
- **Web User Edit** – used to investigate/shutdown email accounts that violated terms of use
- **Passport Support Tool** – used to verify a user's account status and to block/ban a Microsoft user. In fiscal year 2011 (i.e., 2010), changes were made to the PST tool to allow CPSS to support customers on new features. The Windows Live group (not OST) was also discussing developing a shared support tool to replace PST and WUE.
- **Image Classifier** – used to automatically identify potential terms of use violations based on skin tones. Image classifier was implemented around 2011-2012, and used in Bing and SkyDrive. Over the years, each product group iterated new versions of image classifer to adopt to its particular business needs and reduce the amount of false positives. CVS deployed image classifier in Marketplace (third-party apps) around 2013.

EXHIBIT AD

- **File Finder** – tool created specifically to help agents moderating content in SkyDrive. It allowed agents to find specific files and was used as part of the forensics investigation project. Gary Anderson requested this tool and it was deployed around summer 2012.
- **Bing Index Tracker (BIT)** – Tool used to review images on Bing. In November 2011, the team identified issues with this tool breaking. It is unclear whether the team proposed an alternative tool for Bing. In 2012 members of the Online Safety Team identified the need for improved reporting in BIT; again, it is unclear whether the team proposed solutions.
- **CVS** – centralized tool for content moderation across Microsoft products, which Microsoft began developing in 2012 and began deploying automated scanning in Windows Phone Store and PinPoint in around 2013. By 2014, CVS added a video classifier. CVS has continued to add products over the years to continue centralizing automated scanning and NCMEC reporting.
- **Avert** – This is a tool within CVS that replaced UAT and allows agents to review images in thumbnail, blurred, and black/white format to reduce human impact. This tool was added in 2016.

**Requests for Tools:** Requests for tools had to be approved by managers within the Online Safety Team and the relevant product groups, and required funding approval from individual lines of business (i.e., from the product groups). The process of funding approval involved concrete technical specifications needed for an engineering team to engage and detail on the implementation costs and benefits. Funding and development decisions were ultimately made by the product groups, not by CSS, the organization within which the Online Safety Team sat.

- The direct managers of the Online Safety Team during the relevant time were: Ronald Schrieber, Julie Lang, Jan Clausen, Tamara Fairbanks, Jenny Lay-Flurrie, Neil Barnett, and Jeff Lilleskare.
- Skip-managers includes: Brian Stoner, Phil Goatley, Matt Fingerhut, Stephen Sorensen, Rene Yoakum, Denise Rundle, Jenny Lay-Flurrie, and Todd Parsons.
- When tool requests were denied, it was often because of:
    1. Failure by the Online Safety Team to provide sufficient specificity to support the request either at a technical level and/or with a cost-benefit analysis
    2. Lack of budget within the product group
    3. Lack of engineering resources within the product group

# EXHIBIT AD

**Exhibit 3**

EXHIBIT AD

Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

HENRY SOTO, et ux., SARA      )
SOTO, as guardian for her     )
minor child, CALUM SOTO,      )
GREG BLAUERT, et ux.,         )
                              )
     Plaintiffs,              ) No. 16-2-31049-4 SEA
                              )
     vs.                      )
                              )
MICROSOFT CORPORATION,        )
                              )
     Defendant.               )

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF
MICROSOFT CORPORATION
ROBERT SIZEMORE

Taken at Schroeter Goldmark & Bender
810 Third Avenue | Suite 500
Seattle, Washington

DATE TAKEN:  June 1, 2018
REPORTED BY:  Mary A. Whitney, CCR - WCRL #2728

---

Page 2

1
2              APPEARANCES
3
4
5   FOR THE PLAINTIFFS,  REBECCA J. ROE, ESQ.
6   Blauert:        Schroeter Goldmark & Bender
7                   810 Third Avenue
8                   Suite 500
9                   Seattle, WA  98104
10                  (206) 622-8000
11                  roe@sgb-law.com
12
13
14  FOR THE PLAINTIFFS,  JOSHUA B. TRUMBULL
15  Soto:           JBT & Associates
16                  106 E. Gilman Avenue
17                  Arlington, WA  98223
18                  (360) 435-1663
19                  josh@jbtlegal.com
20
21
22
23
24  (Cont'd)
25

---

Page 3

1
2              APPEARANCES - (Cont'd)
3
4
5   FOR THE PLAINTIFFS,   BEN W. WELLS, ESQ.
6   Soto:           Wells & Associates
7                   106 E. Gilman Avenue
8                   Arlington, WA  98223
9                   (360) 435-1663
10                  ben@wellsinjurylaw.com
11
12  FOR THE DEFENDANT:   REBECCA J. FRANCIS, ESQ.
13                  Davis Wright Tremaine
14                  1201 Third Avenue
15                  Suite 2200
16                  Seattle, WA  98101
17                  (206) 622-3150
18                  rebeccafrancis@dwt.com
19
20  ALSO PRESENT:     HENRY SOTO - (Telephonic)
21                    GREG BLAUERT - (Telephonic)
22                    PAUL BLAUERT
23
24                    -o0o-
25

---

Page 4

1
2       30(b)(6) DEPOSITION OF MICROSOFT CORPORATION
3                  ROBERT SIZEMORE
4
5
6              EXAMINATION INDEX
7   EXAMINATION BY                  PAGE
8   Mr. Wells    ....................   6
9   Ms. Roe      ....................  75
10  Mr. Wells    .................... 105
11  Ms. Roe      .................... 110
12
13
14              EXHIBIT INDEX
15  EXHIBITS FOR IDENTIFICATION        PAGE
16  No. 167 -  Policy Overview      19
17  No. 168 -  Letter, 5/22/18, Francis to
18             Roe, Wells and Trumbull   19
19  No. 169 -  Informed Consent     98
20  No. 170 -  PowerPoint          110
21
22
23
24  (Cont'd)
25

EXHIBIT AD

## Page 73

1   presentations to management on mental health.
2   I suspect, given my time on the team and our
3   interaction with Denise Rundle and Stephen Sorensen,
4   that we would have discussed the wellness program with
5   them.
6          Whether they had a full presentation
7   I couldn't speak to. That would have been on Damien
8   and/or Tammy to present.
9       Q. And Denise -- so did you do any
10  storytelling -- well, strike that.
11         But you weren't involved in any of the,
12  like, PowerPoints, then, if there were any, to upper
13  management about that?
14         MS. FRANCIS: I'll object to the form.
15      A. I would have been involved in helping draft
16  the templates, as well as making sure the content made
17  sense, so Damien would have been on point at the
18  subject- matter expert, or Henry, for example, would
19  have also been involved as a PTL to add content to
20  the wellness program that would be presented.
21         However, I might help shape and craft that
22  story to make sure it's targeted, that it has the
23  right emphasis points, and whether or not it's just a
24  bunch of bullet points on a PowerPoint slide or it
25  actually has good content that pops and resonates with

## Page 74

1   the audience.
2       Q. All right. But as you sit here now, you
3   don't recall whether or not you ever were involved in
4   that project?
5          MS. FRANCIS: Objection; asked and
6   answered.
7       Q. You can answer.
8       A. Correct. I don't recall.
9       Q. Do you know what the DSM is?
10      A. I'm sorry, I don't recall.
11      Q. The Diagnostic Statistical Manual having
12  to do with mental health? Do you know anything about
13  that?
14      A. I don't.
15         MS. FRANCIS: I'll object again.
16         It's all within the scope of your personal
17  capacity as opposed to your role as a corporate
18  representative. But go ahead.
19      A. From my personal knowledge, I do not.
20      Q. All right.
21         (Pause in the proceedings.)
22         MR. WELLS: I don't have any anything
23  further.
24         MS. ROE: I have a questions.
25               -o0o-

## Page 75

1               EXAMINATION
2   BY MS. ROE:
3       Q. As I understand it, Mr. Sizemore, you didn't
4   talk to anyone at Microsoft in order to prepare for
5   your testimony, with the exception of in-house
6   counsel?
7       A. That is correct.
8       Q. And with regard to documents that you might
9   have reviewed, that you largely don't remember except
10  for PowerPoints, how were the documents that you
11  reviewed selected?
12         MS. FRANCIS: I'm going to object to the
13  form, and also to the extent this calls for
14  attorney-client-privileged work-product information.
15      A. The documents were collated from counsel and
16  brought together as it relates to the actual subject
17  I'd be testifying on.
18      Q. So counsel for Microsoft presented you
19  with the documents that you should review in order to
20  provide your testimony; is that correct?
21         MS. FRANCIS: Same objection, and I think
22  this is calling for attorney-client-privileged
23  work-product information.
24      A. Given my personal experience did not span the
25  entire length of the team, there was documentation

## Page 76

1   needed in order to educate me on all of the tools and
2   resources, as well as some of the preexisting and --
3   as well as what went on after my exit from the team.
4   So, yes, it was provided.
5       Q. Tell us about the development of Exhibit-167.
6          MS. FRANCIS: Again, same objection. It
7   calls for disclosure of attorney-client-privileged
8   work-product information.
9       A. The development was simply that
10  a summary of all the documentation as was relevant to.
11  As you can imagine, with a very large set of material,
12  you want to condense it down to the most critical
13  points or the salient points related to the specific
14  topic.
15      Q. Well, let's start over.
16         I assume that this document, Exhibit-167,
17  that you've testified from -- in fact, read into
18  the record in significant parts -- is the end product
19  of some earlier drafts. Is that accurate?
20         MS. FRANCIS: Same objection. I think
21  this is all calling for attorney-client-privileged
22  work product.
23         MS. ROE: I think you have undoubtedly and
24  unequivocally waived attorney-client work-product
25  privilege. This is not a document that was

EXHIBIT AD

## Page 77

1    investigated by him under a 30(b)(6). This is
2    a document that was prepared by counsel.
3        MS. FRANCIS: That is incorrect.
4        MS. ROE: Well, let's get his testimony.
5        A. So, this document I drafted from
6    what was provided to me from counsel. As I mentioned,
7    I pulled the salient points as what I saw as relevant
8    that would help me answer the questions as accurately
9    as possible, given that I was being asked on dates,
10    times, how things were implemented and when they
11    were implemented outside of my general scope on the
12    team.
13        Q. Let's talk about the process.
14        When did you first started reviewing
15    documents in preparation for your 30(b)(6) testimony?
16        A. This would have been a few weeks ago.
17    I would say at least three, four weeks.
18        Q. And how did you receive the documents?
19        A. Meaning the form?
20        Q. Email or SharePoint, or a sit-down in
21    a conversation. How?
22        A. It was a sit-down in a conversation with
23    counsel. I was presented with what was perceived
24    as relevant material to help me educate myself on the
25    topics. It was a binder.

## Page 78

1        Q. So you were presented with a binder
2    from counsel. And how long did that initial meeting
3    last?
4        A. From my recollection, the meeting was four to
5    maybe five hours.
6        Q. Did you review those documents at the time
7    of that initial meeting?
8        A. The sheer quantity wouldn't necessitate -- or
9    didn't give me enough time to read everything in that
10    four-to-five-hour period.
11        Q. Okay.
12        A. I took several days thereafter and my own
13    weekend time to comb through the material and
14    understand what was being presented.
15        Q. And if you didn't read the binder of
16    materials that you were presented initially during
17    this first four-to-five-hour meeting, what else
18    occurred during that meeting?
19        MS. FRANCIS: Objection. This calls for
20    attorney-client privileged work-product information.
21        I don't know that he can answer this
22    question. The meeting was with counsel, was with
23    inside counsel and outside counsel, and so the whole
24    meeting was attorney-client-privileged.
25        He told you the meeting happened, he told

## Page 79

1    you what happened, and he told you the documents.
2    I think that's as far as he can go.
3        MS. ROE: Are you instructing him not to
4    answer?
5        MS. FRANCIS: I'm not instructing him
6    anything. I'm saying the entire meeting was
7    attorney-client-privileged and work product. You're
8    asking him about discussions with counsel.
9        It's up to him to decide if that will
10    disclose attorney-client information. I think you're
11    asking for it.
12        MS. ROE: And I think you've waived it.
13        MS. FRANCIS: We've not waived anything.
14        MS. ROE: Okay.
15        MS. FRANCIS: This is a document he just
16    testified that he prepared. He didn't say he prepared
17    it in that meeting --
18        MS. ROE: No, he didn't say that.
19        MS. FRANCIS: He did. He said that he
20    prepared it.
21        MS. ROE: Okay.
22        Q. You had a four-to-five-hour meeting.
23    You were handed a binder of documents prepared by
24    counsel, or selected by counsel. You didn't read all
25    of the documents at that meeting, but this meeting was

## Page 80

1    four to five hours with the attorneys, correct?
2        A. It was four to five hours with the attorneys,
3    yes.
4        Q. All right. And the meeting occurred where?
5        A. On Microsoft's campus.
6        Q. And how many attorneys were there?
7        A. Two to three.
8        Q. Well --
9        A. We had two, and we had three at one point,
10    and then one would leave the room, so it was between
11    two to three, not for the full four to five hours.
12        Q. And Blake, the in-house counsel, as present
13    here today, was present?
14        A. She was.
15        Q. And how about Ms. Francis?
16        A. She was.
17        Q. And who else came in and out?
18        A. Well, outside counsel did not leave the room,
19    other than for bathroom breaks, but Rob -- I forget
20    his last name -- was also there.
21        Q. Rob Maguire.
22        A. Rob Maguire.
23        Q. All right.
24        Now, during the course of this
25    four-to-five-hour meeting, were you given other

EXHIBIT AD

Page 81

1 factual information?
2     A.  I was asked questions from my own personal
3 experience.  Given the fact that I was the program
4 manager on the team involved in tool development,
5 my added insights that are not in documents or maybe
6 personal experiences were part of the discussion.
7     Q.  Were you given any information, factual
8 information, by counsel during the course of that
9 meeting?
10        MS. FRANCIS:  Objection; asked and
11 answered.
12     A.  Outside of the binder, I was simply being
13 asked questions about my experience.
14     Q.  What did you then do following that
15 four-to-five-hour meeting?
16     A.  As mentioned, I then took it serious and sat
17 down as a representative of the company to educate
18 myself on IOSE, PhotoDNA, the tools, the policies,
19 some of which I already had some personal knowledge
20 of, but there was additional documentation that was
21 outside of my scope and role, either based on
22 my tenure with the team or even just because it wasn't
23 under my purview.
24     Q.  All right.  So then you spent how much time,
25 approximately how much time, reviewing the binder of

Page 82

1 material?
2     A.  Well, given the fact that it was a very large
3 binder, I would say that I took easily two to
4 three weeks reading as much as I could at any given
5 time, flipping through the pages of the presentations,
6 trying to digest as much of the volume as I could, and
7 to distill the points out of the document -- or the
8 set of documents, that I could use for reference.
9        Then I asked the attorneys if I could
10 bring in a document to help reference, which is
11 what the product is before us.
12     Q.  Let's talk about the process you went through
13 when you were reviewing the binder full of documents.
14        Are we talking about, like, one
15 three-inch, three-ring binder?
16     A.  The binder behind you is probably, what, six
17 to seven inches?  It's about that size.
18     Q.  And did you make notes on any of those
19 documents?
20     A.  I refrained from doing anything to the actual
21 documents themselves, but I did use a legal pad to
22 bullet out my ideas and anything I saw in a particular
23 presentation or document.  I might have dog-eared a
24 couple of pages so I could go back and reference them
25 again.

Page 83

1     Q.  Did you ask for any additional documents?
2     A.  From what I could tell in the folder,
3 that was more than sufficient.  I didn't see the need
4 of asking for or requesting additional documentation.
5     Q.  So the answer is no, you did not ask for any
6 additional documents?
7     A.  Correct.
8     Q.  Did you ask to review the depositions of
9 any other people in this case?
10     A.  I did not ask to review depositions, no.
11     Q.  And I think you've indicated you didn't
12 review -- you are not aware that you reviewed
13 Jay Cramer's and you know you didn't review
14 Brenda Chamberlain's.  Did you review Damien Vaught's?
15     A.  No, I did not.
16     Q.  How about Matt Sullivan?
17     A.  I did not.
18     Q.  I think you also said you did not review
19 Mr. Sorensen's?
20     A.  Correct.
21     Q.  It sounds like you really only reviewed your
22 own?
23     A.  Primarily, it was mine.  I do recall some
24 documentation in relation to Henry and Greg.  I don't
25 know if that was the actual deposition itself.

Page 84

1 As I said, the binder was large and I went over a lot
2 of documents over the course of a couple of weeks.
3     Q.  Then at what point did you first present your
4 written product to counsel?
5     A.  I submitted my written product via email
6 communications under attorney-client privilege
7 to counsel for review maybe a week and a half ago
8 as the initial draft.
9     Q.  Then what happened?
10        MS. FRANCIS:  I'm going to object.  This
11 calls for attorney-client-privileged work-product
12 information.
13     A.  I continued to iterate on the document and,
14 as mentioned, there were other prep sessions with
15 counsel.
16     Q.  So when you say "iterate on the document,"
17 you mean make changes to the document based on your
18 conversations with counsel --
19        MS. FRANCIS:  Same objection.
20     Q.  -- is that correct?
21        MS. FRANCIS:  Same objection.
22     A.  Not strictly based on conversations with
23 counsel.  Much of the changes were based on
24 clarifications, looking for the actual dates.  It was
25 a large binder.

EXHIBIT AD

I BARBARA MINER Clerk of the Superior Court of the State of Washington
for King County do hereby certify that this copy is a true and perfect transcript
of said original as it appears on file and of record in my office and of the whole
thereof IN TESTIMONY WHEREOF I have affixed this seal of said Superior
Court at my office at Seattle on this date_____

JUL   4 2020

BARBARA MINER Superior Court Clerk

By A. GALLARDO
Deputy Clerk

EXHIBIT AD